J. I. MORGAN, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.

J. I. MORGAN AND FRANCES MORGAN, PETITIONERS, *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT.

Docket Nos. 61345, 61346.   Filed July 9, 1958.

*Carl E. Davidson, Esq.,* and *Charles P. Duffy, Esq.,* for the
petitioners.

*John D. Picco, Esq.,* for the respondent.

WITHEY, *Judge:* The respondent determined deficiencies in peti-
tioners' income tax for the years and in the amounts as follows:

| Name | Docket No. | Fiscal year ended April 30 | Deficiency |
|------|-----------|------|-----------|
| J. I. Morgan, Inc. | 61345 | 1952 | $11,601.55 |
| | | 1953 | 60,872.75 |
| | | 1954 | 56,610.97 |
| | | 1950 | 4,512.22 |
| J. I. Morgan and Frances Morgan | 61346 | 1951 | 2,122.29 |
| | | 1952 | 10,141.54 |
| | | 1953 | 16,618.28 |
| | | 1954 | 3,305.34 |

The issues presented for our determination are the correctness of
the respondent's action (1) in determining that the acquisition of
assets by the petitioner J. I. Morgan, Inc., in exchange for an install-

ment contract constituted a nontaxable exchange of property for stock within the meaning of section 112 (b) (5) of the Internal Revenue Code of 1939; (2) in determining that the assets acquired by J. I. Morgan, Inc., retain the same basis as they had in the hands of the transferors prior to the transfer; (3) in disallowing the deductions claimed by J. I. Morgan, Inc., for interest paid to J. I. Morgan pursuant to an installment contract; (4) in determining that petitioner J. I. Morgan received dividend distributions under the guise of payments of principal and interest from J. I. Morgan, Inc.; and (5) in determining that the increment in value of an· "Accumulative Investment Certificate" is in the nature of interest and constitutes ordinary income to J. I. Morgan.

### GENERAL FINDINGS OF FACT.

Some of the facts have been stipulated and are found accordingly.

Petitioners J. I. Morgan and Frances Morgan are husband and wife residing at New Meadows, Idaho. They filed their joint income tax returns for 1950, 1951, 1952, 1953, and 1954 with the director of internal revenue for the district of Idaho. They kept their books of account and prepared their income tax returns on an accrual basis.

Petitioner J. I. Morgan, Inc. (sometimes hereinafter referred to as the corporation), is a corporation orgainzed under the laws of the State of Idaho with its principal office located at New Meadows, Idaho. The corporation filed its income tax returns for 1952, 1953, and 1954 with the director of internal revenue for the district of Idaho. J. I. Morgan, Inc., kept its books of account and prepared its income tax returns on an accrual basis.

*Issues 1, 2, 3, and 4.—Sale or Exchange Under Section 112 (b) (5), I. R. C. 1939, and Related Issues.*

### FINDINGS OF FACT.

For several years prior to 1946, J. I. Morgan was employed by the Boise Payette Lumber Company (sometimes hereinafter referred to as Boise Payette or the company) as its logging superintendent and master mechanic. He became dissatisfied with his employment in this capacity but Boise Payette desired to have him continue the logging of its timber. As a result, a written agreement, dated April 1, 1946, was executed by Boise Payette and Morgan, by the terms of which the latter agreed to log timber for the company as an independent contractor.

At the time of the execution of the agreement, Boise Payette and Morgan entered into a separate contract whereby Boise Payette agreed to sell Morgan its logging equipment, together with certain

buildings and other property, for a total purchase price of $234,685.05. The logging equipment constituted substantially all of the equipment which the company theretofore had used in its logging operations. The purchase price (equivalent to Boise Payette's book value plus 20 per cent) was to be paid by charges against the operating account of J. I. Morgan at the rate of $1.75 per 1,000 feet of logs produced by Morgan's logging operations. No interest was payable on the deferred balance. The contract was fully performed and title to the land and equipment was transferred to Morgan on or about March 21, 1950. Upon execution of the contract, Morgan's operating account with the company was charged with additional items amounting to $109,647.84, making a total cost to J. I. Morgan of $344,332.89. After April 1, 1946, the logging operations for Boise Payette Lumber Company were conducted by Morgan as sole proprietor, with Edward N. Morgan employed as equipment foreman and Edward S. Millspaugh employed as logging superintendent. Edward N. Morgan and Edward S. Millspaugh were compensated at an agreed rate based on the number of feet of logs produced. In the spring of 1950, however, an arrangement was made whereby J. I. Morgan was to receive 60 per cent of the net income of the logging operations and Edward N. Morgan and Millspaugh were each to receive 20 per cent of net income.

J. I. Morgan, Edward N. Morgan, and Millspaugh had worked together for a number of years and J. I. Morgan had developed great confidence in their ability and desired to retain their services. However, Edward N. Morgan and Millspaugh were not satisfied to continue as employees of J. I. Morgan and demanded a proprietary interest in the business.

J. I. Morgan, Inc., was incorporated under the laws of the State of Idaho on November 29, 1948, with an authorized issue of common capital stock of 2,500 shares at a par value of $100 each. Until June 1, 1950, only 3 shares of stock in J. I. Morgan, Inc., were subscribed—one each by J. I. Morgan, Frances Morgan, and Edward N. Morgan. The corporation was inactive until after October 1, 1950.

On June 5, 1950, a special meeting of the board of directors of J. I. Morgan, Inc., was held for the purpose of discussing the advisability of subscribing for additional capital stock of the corporation in the amount of $10,000. The directors were J. I. Morgan, Frances C. Morgan, and Edward N. Morgan. J. I. Morgan indicated a willingness to subscribe for $6,000 worth of stock of the corporation and Edward N. Morgan and Millspaugh each agreed to subscribe for $2,000 worth of the corporation stock. Consequently, resolutions were adopted by the directors authorizing J. I. Morgan, Inc., to issue and deliver 59 shares of the capital stock of the corporation to J. I. Morgan, 1 share to Frances Morgan, and 20 shares each to Edward N. Morgan and Edward S. Millspaugh in consideration of $100 per share. The

capital stock of the corporation was paid for on or about October 1, 1950, at which time it was issued and delivered in accordance with the corporate resolution. The remaining 2,400 shares of the capital stock remain unsubscribed. Edward N. Morgan and Millspaugh were agreeable to continuing as 20 per cent stockholders in J. I. Morgan, Inc., but they were unwilling to accept a smaller proportionate interest therein.

The stockholders discussed the possibility of expanding the operations of the corporation by engaging in road construction, land clearing, and the milling of jack pine, but they eventually rejected those suggestions. J. I. Morgan also contemplated leasing to the corporation his logging equipment but the idea finally was abandoned. The initial capital investment in the amount of $10,000 would have been sufficient to enable the corporation to continue its operations in the event the directors had decided to rent the logging equipment of J. I. Morgan.

After deciding to sell the logging equipment to the corporation, J. I. Morgan and Frances Morgan submitted a written offer to the corporation to sell to it certain real and personal property, including logging equipment, for $500,000, together with the assumption by the corporation of certain of the liabilities of J. I. Morgan in the amount of $129,682.55. The offer was accepted by the directors of J. I. Morgan, Inc., on September 25, 1950.

On or about October 1, 1950, J. I. Morgan and Frances C. Morgan executed a written contract of sale with J. I. Morgan, Inc., pursuant to which they sold certain real estate, logging equipment, machine shop equipment, office equipment, and other personal property to the corporation. The contract provided, in part, as follows:

It is expressly and specifically agreed that title to said property, or any part thereof, or any additions thereto or improvements thereon, shall not pass from the Sellers to the Purchaser until the entire purchase price shall have been paid in full, and that no right, title or interest, legal or equitable, in the property aforesaid, or any part thereof, shall vest in the Purchaser until the delivery of the deed and bill of sale by the Sellers, or until the payment of its purchase price in full, and at the times and in the manner herein provided.

The contract called for fixed payments to be made to the transferors without regard to the earnings of the corporation. No agreement was made by the transferors not to enforce collection of the payments and the corporation was required at its own expense to maintain the property, to bear the risk of loss, and keep the transferred assets insured for the benefit of both the buyer and seller as their interests might appear.

The adjusted basis to J. I. Morgan of the depreciable assets which were transferred by him to J. I. Morgan, Inc., on October 1, 1950,

was $177,634.69. The adjusted basis in the hands of J. I. Morgan of all the assets sold to the corporation on October 1, 1950, was $214,377. The property and equipment transferred to J. I Morgan, Inc., pursuant to the contract of sale executed on October 1, 1950, had a fair market value on that date of not less than $629,682.55.

In addition to the aforementioned property, J. I. Morgan also transferred to the corporation without additional consideration, cash in the payroll account in the amount of $12,500; inventory of logs, $1,000; inventory in warehouse, $23,242.31; roads constructed at a cost of $27,432.96; and bunk and cook houses constructed at a cost to J. I. Morgan of $11,970.67. Further, J. I. Morgan assigned his logging contract with Boise Payette Lumber Company to J. I. Morgan, Inc., without additional consideration.

The opening journal entries on the books of the corporation as of October 1, 1950, were as follows:

|  | Dr. | Cr. |
|---|---|---|
| **(1)** |  |  |
| 10–1–50    Cash | $10,000.00 | |
| Capital stock | | $10,000.00 |
| To record capital stock issued for cash as follows: | | |
| J. I. Morgan...............$6,000.00 | | |
| Ed Millspaugh...............2,000.00 | | |
| Ed Morgan...............2,000.00 | | |
| Total...............10,000.00 | | |
| **(2)** |  |  |
| 10–1–50    Cash in bank—payroll account | $12,500.00 | |
| Accounts receivable—general [1] | 14,520.56 | |
| Accounts receivable—petty ledger [1] | 1,679.93 | |
| Inventory—logs | 1,000.00 | |
| Inventory—warehouse | 23,242.31 | |
| Plant, property and equipment | 537,336.12 | |
| Garden Valley roads | 27,432.96 | |
| Bunk and cook houses | 11,970.67 | |
| Invoices payable: | | |
| Equipment...............$8,215.59 | | |
| #23 Purchases...............18,298.06 | | |
| | | 26,513.65 |
| Costello & Miller | | 6,000.00 |
| Payroll payable: | | |
| Bonuses—Ed M. & Ed M...............1,355.65 | | |
| —Dec. 31...............6,528.75 | | |
| —vacation...............8,368.50 | | |
| | | 16,252.90 |
| Boise Payette Lumber Company | | 77,041.49 |
| Accrued property taxes | | 3,874.51 |
| Note payable J. I. Morgan | | 500,000.00 |

To record purchase of business from J. I. Morgan, paying for same with note.

[1] The receivables noted above were inserted by inadvertence. These assets actually were retained by J. I. Morgan.

The balance sheet of the corporation as of October 1, 1950, was as follows:

ASSETS

| | |
|---|---|
| Cash in bank | $10,000.00 |
| Cash in bank, payroll a/c | 12,500.00 |
| Accounts receivable [1] | 14,520.56 |
| Petty ledger receivables [1] | 1,679.93 |
| Inventory, logs | 1,000.00 |
| Inventory, warehouse | 23,242.31 |
| Plant, property, equipment _____ $576,739.75 | |
| Depreciation reserve | 576,739.75 |
| Total | 639,682.55 |

LIABILITIES AND CAPITAL

| | |
|---|---|
| Accounts payable | 26,513.65 |
| Accrued expenses payable | 26,127.41 |
| Boise Payette operating a/c payable | 77,041.49 |
| Note and mortgage payable | 500,000.00 |
| Capital stock | 10,000.00 |
| Total | 639,682.55 |

[1] The receivables noted above were inserted by inadvertence. These assets actually were retained by J. I. Morgan.

A downpayment of $2,000 was paid by the corporation to J. I. Morgan during 1950 on the price of the assets acquired from him. The balance due pursuant to the installment sales contract, together with interest thereon at the rate of 2 per cent per annum beginning May 1, 1951, was to be paid as follows:

$75,000.00, together with interest then due, on or before the 31st day of December, 1952; and a like sum of

$75,000.00, together with interest on the unpaid balance, on or before the 31st day of December of the years 1953, 1954, 1955, 1956 and 1957, and the remaining balance of

$50,000.00, together with interest due thereon, on or before the 31st day of December, 1958.

Because of the expanded logging operations and the necessity of purchasing additional equipment, J. I. Morgan agreed, pursuant to a written agreement dated December 19, 1952, to extend the time for payment of the first installment due under the contract. Thereafter, the corporation made a payment of $30,860 on December 31, 1953, under the contract as modified, and 14 payments, aggregating $43,-123.12, from May 1, 1954, to August 31, 1955. The respondent determined that the foregoing payments for the years 1950, 1953, and 1954 constituted taxable dividends paid to petitioners J. I. Morgan and Frances Morgan. During 1954 and 1955, J. I. Morgan, Inc., also made payments on its open account with J. I. Morgan totaling $77,876.88.

On or about July 19, 1955, a revenue agent commenced an examination of the income tax liabilities of the petitioners. During the course

of his examination, the agent proposed to treat the transfer of assets from J. I. Morgan to the corporation pursuant to the installment contract as a nontaxable exchange under the provisions of section 112 (b) (5) of the 1939 Code. Consequently, after August 31, 1955, no further payments were made by the corporation pending final settlement of the present controversy.

Beginning on October 1, 1950, and continuing through the corporation's fiscal year ended April 30, 1954, J. I. Morgan, Inc., claimed deductions for depreciation in the following amounts:

| Fiscal year ended April 30 | Amount |
|---|---|
| 1951 | $47,732.13 |
| 1952 | 174,846.57 |
| 1953 | 118,523.78 |
| 1954 | 180,943.54 |

J. I. Morgan, Inc., claimed deductions for interest paid to J. I. Morgan and Frances Morgan pursuant to the installment sales contract for the years and in the amounts as follows:

| Fiscal year ended April 30 | Amount |
|---|---|
| 1952 | $9,960.00 |
| 1953 | 9,960.00 |
| 1954 | 9,277.62 |

The respondent determined that the foregoing payments to petitioners J. I. Morgan and Frances Morgan constituted taxable dividends. No dividends have been declared to date by J. I. Morgan, Inc.

In their joint income tax return for 1950, petitioners J. I. Morgan and Frances Morgan indicated their intention to report on the installment basis the taxable gain realized from the transfer of assets to the corporation. They accordingly reported capital gains resulting from the foregoing transaction as follows:

| Year | Amount |
|---|---|
| 1950 | $642.73 |
| 1953 | 9,386.85 |
| 1954 | 3,864.03 |

J. I. Morgan, Inc., reported its net income (or loss) for each of the years in question, before claiming a net operating loss deduction, as follows:

| Fiscal year ended April 30 | Amount |
|---|---|
| 1951 | ($30,198.80) |
| 1952 | (38,632.00) |
| 1953 | 33,248.89 |
| 1954 | 22,133.16 |
| 1955 | 52,886.89 |
| 1956 | 44,556.11 |

The books of account of the corporation reflect the following amounts of property, plant, and equipment (excluding roads) and reserves for depreciation:

|  | Property, plant, and equipment | Reserve for depreciation |
|---|---|---|
| Sept. 30, 1950 | $549,306.79 | |
| Net additions | 76,916.31 | $62,732.13 |
| Apr. 30, 1951 | 626,223.10 | 62,732.13 |
| Net additions | 121,824.96 | 98,069.59 |
| Apr. 30, 1952 | 748,048.06 | 160,801.72 |
| Net additions | 50,808.77 | 110,389.33 |
| Apr. 30, 1953 | 798,856.83 | 271,191.05 |
| Net additions | 166,514.20 | 129,384.18 |
| Apr. 30, 1954 | 965,371.03 | 400,575.23 |
| Net additions | 68,046.93 | 149,076 14 |
| Apr. 30, 1955 | 1,033,417.96 | 549,651.37 |
| Net additions | 225,001.47 | 143,659.10 |
| Apr. 30, 1956 | 1,258,419.43 | 693,310.47 |

In addition to making the foregoing expenditures for property, plant, and equipment, J. I. Morgan, Inc., expended substantial amounts for the construction of logging roads during the years in issue.

The corporation had the following number of employees at the end of each of the following years:

| Year | Number |
|---|---|
| 1950 | 83 |
| 1951 | 105 |
| 1952 | 121 |
| 1953 | 112 |
| 1954 | 111 |
| 1955 | 129 |
| 1956 | 135 |

The net profit (or loss) of the corporation for the taxable years 1950 through 1955, inclusive, as shown on its income tax returns for those years was as follows:

| Year | Net profit (or loss) |
|---|---|
| 1950 | ($31,198.80) |
| 1951 | (41,032.00) |
| 1952 | (1,308.78) |
| 1953 | 28,582.79 |
| 1954 | 52,886.89 |
| 1955 | 44,556.11 |

OPINION.

The respondent has determined that the installment contract executed by J. I. Morgan and Frances C. Morgan on October 1, 1950, in fact represented equity capital; and that the acquisition of assets by the corporation in exchange for the installment contract constitutes a nontaxable exchange of property solely for stock within the meaning of section 112 (b) (5) of the 1939 Code.[1]   Consequently, the respondent further determined that the assets acquired by J. I. Morgan, Inc., retain the same basis as they had in the hands of the transferors immediately prior to the exchange under section 113 (a) (8) of the 1939 Code and that the amounts paid by the corporation to the transferors were in fact dividend distributions.

Petitioners contend that the execution of the installment contract on October 1, 1950, constituted a sales transaction and created a valid debtor-creditor relationship between the transferors and the transferee corporation.   The petitioners therefore contend that the gain realized on the transaction should be recognized and that the corporation is entitled to utilize the fair market value of the assets at the time of the transfer as the proper basis.   Sec. 113 (a), 1939 Code.

In support of their position the petitioners rely on our decision in *Warren H. Brown*, 27 T. C. 27.   In that case the taxpayers contributed assets worth $270,000 to a newly formed corporation and subsequently conveyed to the corporation assets valued at $605,138.75, pursuant to an installment sales contract reserving title in the transferors until the full purchase price was paid.   The business purpose underlying the execution of the installment sales contract was the refusal of one of the transferors to accept the risks attendant upon a further capital investment in the new corporation.   Under local law, the reservation in the transferor of title to personal property sold under an installment sales contract created in the transferor a right to possession and ownership superior to the rights of all other creditors of the transferee.   The installments due the transferors during the years there in issue were

---

[1] SEC. 112. RECOGNITION OF GAIN OR LOSS.
  (b) EXCHANGES SOLELY IN KIND.—

   *        *        *        *        *        *        *

   (5) TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation ; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange.   Where the transferee assumes a liability of a transferor, or where the property of a transferor is transferred subject to a liability, then for the purpose only of determining whether the amount of stock or securities received by each of the transferors is in the proportion required by this paragraph, the amount of such liability (if under subsection (k) it is not to be considered as "other property or money") shall be considered as stock or securities received by such transferor.

paid by the corporation with interest thereon. Such payments were not dependent upon the earnings of the corporation.

Further, the record there did not disclose an agreement not to enforce the collection of payments from the corporation. The contract price was equal to the fair market value of the assets transferred thereunder. We there held that the transaction in question constituted a bona fide sale by the stockholder to the corporation, rather than a contribution to capital.

The factual situation involved in *Warren H. Brown, supra*, closely parallels the facts here presented, and we are of the opinion that our decision in that case is controlling here.

On October 1, 1950, J. I. Morgan and Frances C. Morgan executed an installment contract by the terms of which they agreed to sell to J. I. Morgan, Inc., certain real and personal property for $500,000, together with the assumption by the corporation of liabilities of J. I. Morgan in the amount of $129,682.55. Pursuant to the terms of the contract of sale, title to all of the transferred property was retained by J. I. Morgan and Frances C. Morgan until the purchase price, with interest at the rate of 2 per cent per year, is paid in full. Sixty per cent of the stock of the corporation was owned by J. I. Morgan and Frances C. Morgan, and 20 per cent of the stock was owned by Edward S. Millspaugh and 20 per cent by Edward N. Morgan.

J. I. Morgan, Edward N. Morgan, and Edward S. Millspaugh had worked together as a unit for some years, and J. I. Morgan had developed considerable confidence in the ability of Edward N. Morgan and Millspaugh and consequently desired to retain their services. However, Edward N. Morgan and Millspaugh were not satisfied to continue as employees of J. I. Morgan and demanded a proprietary interest in the business. Accordingly, if Edward N. Morgan and Millspaugh were to continue in the logging operation with J. I. Morgan, a change in the form of business appeared necessary. As a result, J. I. Morgan, Edward N. Morgan, and Millspaugh made cash contributions to the corporation in the amounts of $6,000, $2,000, and $2,000, respectively, in exchange for stock in the foregoing amounts.

The original capital investment in the amount of $10,000 would have been adequate to continue the operations of the business if J. I. Morgan had leased to the corporation his logging equipment as he had at one time considered. After abandonment of the idea of leasing the logging equipment to J. I. Morgan, Inc., it became apparent that it would be necessary for the corporation to acquire the equipment if it was to continue a logging operation. If J. I. Morgan and Frances C. Morgan had contributed the logging equipment to the corporation as capital, they would have acquired 99.38 per cent of the stock of the corporation, and Edward N. Morgan and Millspaugh

each would have received only 0.31 per cent of the stock. Neither Edward N. Morgan nor Millspaugh would have consented to the acquisition of only a 0.31 per cent interest in the corporation. Therefore, the decision to transfer the logging equipment owned by J. I. Morgan to the corporation pursuant to an installment contract reserving title in the transferors appears clearly to have been made for an independent business purpose.

Moreover, we are convinced from the testimony of J. I. Morgan, together with the circumstances surrounding the execution of the installment contract and the transfer of the assets thereunder, that the transaction was not motivated by tax considerations. At the time of execution of the installment contract on October 1, 1950, the directors of the corporation intended to make the agreed payments to J. I. Morgan, and J. I. Morgan did not intend to waive the collection of such payments. Their intention at that time cannot be vitiated by changed circumstances or unforeseen difficulties. Although J. I. Morgan subsequently on December 19, 1952, agreed to extend the time for the corporation's payment of the first installment due under the contract because of the necessity of purchasing additional equipment to handle the expanded logging operations, the corporation thereafter on December 31, 1953, made a payment of $30,860 and subsequently made 14 payments, totaling $43,123.12, from May 1, 1954, to August 31, 1955.

The contract called for fixed payments to be made to J. I. Morgan without regard to the earnings of the corporation. Further, the total price in the amount of $629,682.55 to be paid by the corporation for the assets transferred to it pursuant to the installment contract was equal to the fair market value of the assets so transferred.

In addition, as in *Warren H. Brown, supra,* the property was not placed at the risk of the business. Under applicable Idaho law, the reservation in the transferors of title to personal property sold under an installment sales contract creates in the transferors a right of possession and ownership superior to the rights of all other creditors of the transferee. Idaho Code Ann., secs. 64–801, 64–802 (1947) ; *Sparkman* v. *Miller-Cahoon Co.,* 282 Pac. 273. The real estate included in the contract of sale remains the property of the transferors so long as they retain record title. Idaho Code Ann., sec. 55–812 (1947).

The respondent insists that the existence here of a predominant debt structure (50 to 1 debt-stock ratio) on the part of the corporation places the petitioners in an untenable position. However, we are unable to accept the proposition that this capitalization standing alone is sufficient to justify the treatment of an installment sales contract as evidence of equity capital. See *Sheldon Tauber,* 24 T. C. 179; *Harry F. Shannon,* 29 T. C. 702. Further, the capitalization of the corporation does not appear to have been inadequate. Al-

though it sustained losses during the first 3 years of its operation, during 1953, 1954, and 1955, its net profits as disclosed on its Federal income tax returns amounted to $28,582.79, $52,886.89, and $44,556.11, respectively. Throughout the period 1950–1955, the corporation expended substantial sums in acquiring additional property, equipment, and plant facilities, and in the construction of logging roads. In addition, it increased the number of its employees from 83 at the end of 1950 to 135 at the end of 1956. There is no indication in the record that J. I. Morgan, Inc., acquired additional funds either through debt or equity financing after commencing operations in 1950, nor is there evidence of any attempt to do so.

Petitioner's ability to conduct its operations with small capital is accounted for at least in part by the fact that its principal asset, outside of its logging equipment, was a contract with Boise Payette Lumber Company to perform all of its logging operations. Aside from the fact that the record discloses a long and friendly relationship between J. I. Morgan and Boise Payette, it is further apparent that the latter company desired to divest itself of its logging operations and to retain the services of J. I. Morgan as an independent contractor to perform that function. It seems clear that it was to the best interest of Boise Payette, from that standpoint, and from the further standpoint that it was Morgan's principal creditor, to further the business enterprise of the corporation and to do whatever was necessary to prevent it from falling into financial difficulties.

The respondent relies heavily on our decision in *Gooding Amusement Co.*, 23 T. C. 408, affd. 236 F. 2d 159. The situation there presented involved the incorporation of a partnership pursuant to which the partnership assets were transferred to the new corporation in exchange for stock and notes. The noteholders were partners in the transferor and were in control of the corporation immediately after the exchange. Unlike the sales contract here in question, which by reserving title to the assets in the transferors until the purchase price is paid gives them rights superior to those of other creditors, the notes issued to the transferor by the Gooding Amusement Company were subordinated to the claims of other creditors. Moreover, the majority of the notes there issued remained unpaid long after maturity, whereas the record herein discloses that substantial payments with interest have been made to J. I. Morgan by the corporation. In addition, we placed reliance on the failure of the taxpayers in *Gooding Amusement Co., supra*, to show that nontax considerations motivated the decision to accept the short-term judgment notes of the corporation in exchange for a portion of the assets transferred to it. We have described heretofore the business reasons motivating the execution of the installment sales contract here in issue. In *Gooding Amusement Co., supra*, we held that no gain or loss was recognized

under the provisions of section 112 (b) (5) of the 1939 Code on the ground that the notes received by the transferor in exchange for a portion of the assets transferred to the corporation were actually evidence of equity capital. In our opinion, the situation here presented is factually distinguishable. from the circumstances involved in *Gooding Amusement Co., supra.*

In view of the form of the contract here in issue, the reservation of title in the transferors until the full purchase price is paid, the business considerations underlying the execution of the installment sales contract, the superior position of the claims of J. I. Morgan to the claims of other corporate creditors, the contract provision requiring certain fixed payments to be made to the transferors without regard to corporate earnings, the absence of an agreement not to enforce collection, the provision requiring the payment of interest to J. I. Morgan at a reasonable rate, the fact that the contract price was equal to the fair market value of the assets transferred thereunder, and the substantial payments of principal and interest to J. I. Morgan under the contract convince us that the transaction which was completed on October 1, 1950, constituted a bona fide sale to the corporation rather than a contribution to corporate capital.

Under the installment sales contract, the corporation is liable for the payment of a fixed purchase price. It has made an investment in the logging equipment and is required under the contract to maintain the property, to keep it insured, and to bear the risk of loss. Thus, despite the fact that J. I. Morgan, Inc., does not hold legal title to the property, the burden of depreciation falls upon it. *E. J. Murray,* 21 T. C. 1049. Consequently, under section 113 (a) of the 1939 Code, the basis for depreciation of the assets, the right to possession and use of which were acquired by the corporation on October 1, 1950, is the cost of the assets to the corporation. In addition, the corporation is entitled to the deductions claimed by it for interest paid to the transferors pursuant to the installment sales contract during the fiscal years ended April 30, 1952, 1953, and 1954. We further hold that the amounts received by the transferors from the corporation during the years in issue as payments of principal and interest pursuant to the installment sales contract do not constitute a distribution of dividends.

### *Issue 5.—Investment Certificate.*

#### FINDINGS OF FACT.

On or about August 10, 1937, J. I. Morgan acquired an "Accumulative Investment Certificate," Series F–232668, from Investors Syndicate (presently known as Investors Diversified Services, Inc.) of Minneapolis, Minnesota. Under the terms of the certificate, the issu-

ing company agreed to pay to Morgan (with certain options) at the expiration of 15 years, an amount in excess of his aggregate payments. On September 28, 1952, J. I. Morgan exercised one of the available options to extend the certificate for an additional period of not more than 10 years.

The following is a detailed statement of the foregoing "Accumulative Investment Certificate":

INVESTORS SYNDICATE ⎫ Name Changed on 3-30-49 to:
Minneapolis, Minnesota ⎬ Investors Diversified Services, Inc.
*Number—Series F232668* ⎭
*Dated 8-10-37*
*Annual Advance Payment for 15 years* _____ $600.00
Maturity in 15 years
  (option 13 elected 9-28-52 to continue not more than 10 years)
With optional settlement privileges.

| Cash value for each $25 maturity | Year | To | Cash value end of year | Paid in | Excess of cash value over amounts paid in | Yearly increase |
|---|---|---|---|---|---|---|
| $44 | 1 | | $220 | $600 | | |
| 134 | 2 | | 670 | 1,200 | | |
| 264 | 3 | | 1,320 | 1,800 | | |
| 400 | 4 | | 2,000 | 2,400 | | |
| 540 | 5 | | 2,700 | 3,000 | | |
| 700 | 6 | | 3,500 | 3,600 | | |
| 860 | 7 | | 4,300 | 4,200 | | |
| 1,024 | 8 | | 5,120 | 4,800 | | |
| 1,200 | 9 | | 6,000 | 5,400 | | |
| 1,418 | 10 | 8-10-47 | 7,090 | 6,000 | | |
| 1,600 | 11 | 8-10-48 | 8,000 | 6,600 | | |
| 1,810 | 12 | 8-10-49 | 9,050 | 7,200 | $1,850 | |
| 2,020 | 13 | 8-10-50 | 10,100 | 7,800 | 2,300 | $450 |
| 2,240 | 14 | 8-10-51 | 11,200 | 8,400 | 2,800 | 500 |
| 2,500 | 15 | 8-10-52 | 12,500 | 9,000 | 3,500 | 700 |
| 2,724 | 16 | 8-10-53 | 13,620 | 9,600 | 4,020 | 520 |
| 2,958 | 17 | 8-10-54 | 14,790 | 10,200 | 4,590 | 570 |

## OPINION.

The respondent has determined that the annual increases in the excess of the cash value of an Investors Syndicate certificate over the amounts paid in represent interest taxable as ordinary income during the years of increase. The amounts determined by respondent to be taxable income to petitioners for the years 1950, 1951, 1952, 1953, and 1954 are $450, $500, $700, $520, and $570, respectively.

Petitioners contend that the annual increment in the cash value of such a certificate is not properly taxable during the years of increase, but is taxable only upon retirement at maturity as capital gain under section 117 (f) of the 1939 Code.[2]

[2] SEC. 117. CAPITAL GAINS AND LOSSES.

(f) RETIREMENT OF BONDS, ETC.—For the purposes of this chapter, amounts received by the holder upon the retirement of bonds, debentures, notes, or certificates or other evidences of indebtedness issued by any corporation (including those issued by a government or political subdivision thereof), with interest coupons or in registered form, shall be considered as amounts received in exchange therefor.

An identical issue involving the same type of certificate issued by Investors Syndicate was presented in *George Peck Caulkins*, 1 T. C. 656, affd. 144 F. 2d 482. We there held that the certificate owned by the taxpayer constituted an evidence of indebtedness within the meaning of section 117 (f) of the 1939 Code, and that the annual increment in the cash value of the certificate should properly be reported as capital gain upon retirement at maturity. Our decision in that case is squarely in point here. We accordingly hold that under section 117 (f) of the 1939 Code and section 1232 (a) (1) of the 1954 Code, insofar as here applicable, the amounts in question are taxable to petitioners as capital gain at the maturity of the certificate, rather than as interest income during the years of increase.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

---

MURDOCK, *J.*, dissenting: I disagree with that part of this opinion in which it is held that the petitioner is entitled to depreciation on the depreciable assets acquired from the Morgans on October 1, 1950, based upon a "cost" of those assets equal to their fair market value on October 1, 1950, which is stated to be "the date of acquisition." The petitioner got possession of the assets at that time and began to use them in its business but it did not acquire the assets and was not to receive legal title to them until the purchase price was fully paid. The fact that this petitioner was to maintain the property, keep it insured and bear the risk of loss is no justification for giving it depreciation on the assets. These items are taken care of by deductions other than for depreciation.

However, it acquired an equitable interest in and is entitled to some depreciation on the assets. The Commissioner has allowed some depreciation and apparently does not seek to cut down on the amount allowed. Therefore, the Commissioner's determination on this point might be left undisturbed.

This petitioner took deductions for depreciation as follows:

| | |
|---|---|
| 1951 | $47, 732. 13 |
| 1952 | 174, 846. 57 |
| 1953 | 118, 523. 78 |
| 1954 | 180, 943. 54 |
| Total | 522, 046. 02 |

The purpose of deductions for depreciation is to return to the taxpayer, tax free, the cost or basis to it of property being consumed or worn out in its business. The statute provides for the deduction of "a reasonable allowance" for depreciation.

The petitioner was to assume liabilities of Morgan in the amount of $129,682.55, but the record does not show what, if anything, the petitioner ever did to discharge those obligations. It was to pay, in addition, $500,000 in cash, but it paid only $2,000 in 1950 and $30,860 on December 31, 1953, on account of that cash purchase price up to the close of the taxable years. Later it paid a little more and *then further payments were called off by the parties.* Cf. *Lloyd H. Redford,* 28 T. C. 773. The deductions claimed by the petitioner, which deductions or substantial equivalents the opinion allows, would be far in excess of reasonable allowances for depreciation to this petitioner under the circumstances of this case.

If this case cannot be disposed of by making no change in the depreciation allowed by the Commissioner in determining the deficiency and a decision on the merits is necessary, then it seems to me that the petitioner is limited by its economic interest in the depreciable assets.

The *Murray* case cited and the cases relied on in the *Murray* case held that the taxpayer had either equitable or legal title to the property which was being depreciated. I know of no case which holds that a taxpayer could recover such amounts as this taxpayer is being allowed to recover where its actual investment in that property is but a small fraction of the depreciation deductions and, possibly, may never be increased.

RAUM, *J.*, agrees with this dissent.

---

PIERCE, *J.*, dissenting: The situation herein presented is not one wherein the corporation acquired title to the machinery and equipment subject to a purchase money mortgage. Cf. *Crane* v. *Commissioner,* 333 U. S. 1. To the contrary, the agreement which the corporation executed merely gave it possession and use of the property, on the following terms:

It is expressly and specifically agreed that title to said property, or any part thereof, or any additions thereto or improvements thereon, shall not pass from the Sellers to the Purchaser until the entire purchase price shall have been paid in full, and that no right, title or interest, legal or equitable, in the property aforesaid, or any part thereof, shall vest in the Purchaser until the delivery of the deed and bill of sale by the Sellers, or until the payment of its purchase price in full, and at the times and in the manner herein provided.

Thus the agreement was merely a contract to purchase; and the corporation obtained no depreciable interest in the property.

In the alternative, if the agreement was sufficient to convey any interest in the property, the transaction was an exchange under section

112 (b) (5) of the 1939 Code, with a consequent carryover of the transferor's basis. The $10,000 of capital paid into the corporation was obviously an inadequate capitalization to permit "purchase" of the property. The corporation should be considered a "thin" corporation; and the transfer of the property to it should be considered a contribution of additional equity capital.

ATKINS, *J.*, agrees with this dissent.