REAL ESTATE INVESTMENT TRUST OF AMERICA, O. KELLEY ANDERSON, JOHN H. GARDINER, CHARLES SEGAL, PHILIP H. THEOPOLD, FRANCIS C. WELCH, ROBERT S. FIFIELD AND HENRI BOURNEUF, TRUSTEES, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 91582. Filed September 4, 1963.

*Edward C. Thayer*, for the petitioner.
*J. Frost Walker, Jr.*, for the respondent.

OPINION

FAY, *Judge:* Respondent determined deficiencies in petitioner's income tax for the taxable years ended May 31, 1959, and May 31, 1960, in the amounts of $120,707.29 and $26,325.38, respectively. The only issue [1] remaining for decision is whether all or a part of the gain realized upon the sale of a promissory note which was originally acquired at a discount by the seller constitutes interest taxable as ordinary income.

All of the facts have been stipulated and are found accordingly.

Real Estate Investment Trust of America (hereinafter referred to as petitioner) was created in 1955 by the consolidation of the Boston Real Estate Trust (hereinafter referred to as Boston) and several other trusts. Boston was organized in 1886 under the laws of Massachusetts and until the time of its consolidation with other trusts into the petitioner was engaged in the ownership and management of improved business real estate in Boston, Mass., and elsewhere.

Petitioner at all times has kept its records and filed its income tax returns on a cash receipts and disbursements fiscal year basis ending May 31. For the taxable year ending May 31, 1959, petitioner filed its Federal income tax return (Form 1120) with the district director of internal revenue at Boston, Mass.

During the years between 1922 and 1925 the Boston Chamber of Commerce Realty Trust (hereinafter referred to as Realty Trust) erected an office building in Boston, Mass. In addition to the funds raised by the sale of its capital stock, Realty Trust made two borrowings from the Prudential Insurance Co. of America (hereinafter referred to as Prudential). The first borrowing in the amount of $3,600,000 was evidenced by a note dated September 26, 1922, and was secured by a first mortgage on the property. The second borrowing in the amount of $400,000 was evidenced by a note dated June 11, 1925, and was secured by a second mortgage on the property. In 1937 Realty Trust executed and delivered to Prudential a first mortgage on certain personal property contained in the office building as further security for the two notes. In 1940 Realty Trust executed and delivered to Prudential an assignment of all rents from the office building as further security for the two notes.

As of May 12, 1948, there was overdue and unpaid the principal sum of $3,500,000 and in excess of $500,000 of unpaid interest on the two

---

[1] In its petition to this Court, petitioner did not place in issue respondent's adjustments for the fiscal year ended May 31, 1960, and with the exception of the above-stated issue did not contest respondent's other adjustments for the taxable year ended May 31, 1959.

notes. As a result, Prudential insisted upon a substantial reduction in such indebtedness.

On May 12, 1948, Boston, together with Prudential and Realty Trust, entered into a refinancing arrangement. The gist of the arrangement was (1) that Realty Trust was to execute and deliver to Prudential an extension agreement which acknowledged that the principal sum then owed to Prudential was $3 million; (2) that Realty Trust as maker was to execute and deliver to Boston as payee a note dated May 12, 1948, in the face amount of $1 million which was to bear interest of 4 percent per annum and was to mature on September 26, 1952; (3) that Boston was to pay to Prudential $500,000 and to deliver to Prudential an agreement to pay an additional $200,000 without interest on September 26, 1962; (4) that Prudential was to accept the payment of $500,000 and the agreement of Boston to pay $200,000 at a later date in substitution for and satisfaction of that portion of the indebtedness (both principal and interest) then due by Realty Trust to Prudential in excess of $3 million; (5) that Prudential was to discharge its second mortgage of real estate dated June 11, 1925; (6) that as security for the $1 million note Boston was to receive a second mortgage on the real estate, a second mortgage on the personal property contained in the office building, and a secondary assignment of the rents from the office building.

The $1 million note dated May 12, 1948 (hereinafter referred to as the Boston note), and delivered to Boston pursuant to the above arrangements at no time had interest coupons and was at no time in registered form.

By the maturity date of the Boston note, i.e., September 26, 1952, Realty Trust had paid to Boston $113,198.49 of principal, thereby reducing Boston's basis in such note from $700,000 [2] to $586,801.51. In addition, as of September 26, 1952, Realty Trust had paid to Boston the 4 percent interest specified in said note.

On September 26, 1952, an agreement was entered into among Realty Trust, Boston, and Prudential extending the maturity date of the Boston note to September 26, 1957.

During the month of November 1955 Boston and several other trusts were, through the medium of a tax-free exchange and reorganization, consolidated into the petitioner. By virtue of such reorganization, the Boston note was transferred to petitioner and petitioner succeeded to and acquired Boston's basis in the note.

By the extended maturity date of September 26, 1957, Realty Trust had paid to petitioner and its predecessor, Boston, $223,816 of principal on the Boston note, thereby reducing petitioner's basis in such note to $476,184. In addition, Realty Trust had made the interest payments specified in the note. .

---

[2] Cash payment of $500,000 plus indebtedness of $200,000,

On September 26, 1957, an agreement was entered into among Realty Trust, Prudential, and petitioner further extending the maturity date of the note to September 26, 1959, and increasing the interest from 4 percent to 6 percent.

On September 30, 1958, Realty Trust entered into an agreement for the sale of its land and office building to the Federal-Franklin Trust subject to the mortgages held by Prudential and petitioner and subject to the entry of a decree by the Suffolk County Probate Court approving such sale. Following a hearing before the Probate Court on November 5, 1958, a sales price of $559,000 for the equity subject to the two mortgages was authorized. The sale was completed and the property actually conveyed on December 30, 1958.

On November 25, 1958, the petitioner sold the Boston note, which at this time had an unpaid principal balance of $749,053.41, for $719,-053.41 to Fifty Associates, a Massachusetts corporation. The sale was a bona fide transaction. As of the date of the sale Realty Trust had paid to petitioner and its predecessor $250,946.59 of principal on the note thereby reducing petitioner's basis in the note to $449,053.41. In addition, Realty Trust had paid the interest specified in the Boston note, as amended. Petitioner received on the sale of the Boston note $270,000 in excess of its basis in the note. The Boston note was a capital asset in the hands of petitioner and on the date of its sale had been held by the petitioner for more than 6 months.

A few days prior to the completion of the sale of the land and building, the prospective purchaser, Federal-Franklin Trust, requested Fifty Associates, the purchaser of the Boston note from petitioner, to accept payment of the Boston note. Fifty Associates agreed to accept payment and on December 30, 1958, the Boston note was paid by Federal-Franklin Trust.

On its income tax return for the taxable year ended May 31, 1959, petitioner reported the amount received in excess of its basis in the Boston note ($270,000) as long-term capital gain. The respondent determined that the gain realized by petitioner on the sale of the Boston note was taxable as ordinary income.

The only issue presented for our consideration is whether the gain realized by petitioner upon the sale of the Boston note is taxable at ordinary income or capital gains rates. The respondent determined that the difference between the petitioner's basis in the Boston note and the face value of such note (adjusted to the price at which it was sold just before maturity) was interest in the form of an original issue discount. Such being the case, the respondent contends that the gain is taxable as ordinary income.

Petitioner contends that since the Boston note was a capital asset held for more than 6 months and since the sale was a bona fide trans-

action the taxability of the realized gain is governed by the provisions of section 1222(3) of the Internal Revenue Code of 1954.[3]

It is now the generally accepted rule that a right to receive ordinary income produced by a capital asset is not transmuted into a capital asset by the sale or exchange of the capital asset together with the right to receive the ordinary income. *Tunnell* v. *United States*, 259 F. 2d 916 (C.A. 3, 1958); *Rosen* v. *United States*, 288 F. 2d 658 (C.A. 3, 1961); *United States* v. *Harrison*, 304 F. 2d 835 (C.A. 5, 1962); *Fisher* v. *Commissioner*, 209 F. 2d 513 (C.A. 6, 1954), affirming 19 T.C. 384 (1952), certiorari denied 347 U.S. 1014 (1954); *Jaglom* v. *Commissioner*, 303 F. 2d 847 (C.A. 2, 1962), affirming 36 T.C. 126 (1961); *Commissioner* v. *Morgan*, 272 F. 2d 936 (C.A. 9, 1959), reversing 30 T.C. 881 (1958); *Richard B. Gibbons*, 37 T.C. 569 (1961). Consequently, petitioner's reliance upon section 1222(3) of the 1954 Code is misplaced if, in fact, any part of the gain realized upon the sale of the Boston note is attributable to a right to receive ordinary income. The respondent's determination is, of course, presumptively correct and the burden is upon the petitioner to show that its realized gain is attributable to something other than interest. *F. Rodney Paine*, 23 T.C. 391 (1954), reversed on other grounds 236 F. 2d 398 (C.A. 8, 1956).

The record discloses that the petitioner's predecessor acquired the Boston note ($1 million face value) at a cost of $700,000, thereby receiving an original issue discount of $300,000. In the absence of evidence to the contrary, original issue discounts are usually treated as additional compensation for the use of the lender's money. *F. Rodney Paine, supra; L. Lee Stanton*, 34 T.C. 1 (1960); *Richard B. Gibbons, supra; Rosen* v. *United States, supra; United States* v. *Harrison, supra*. See also *American Smelting & Refining Co.* v. *United States*, 130 F. 2d 883, 885 (C.A. 3, 1942). Compensation for the use or forbearance of money is interest, *Deputy* v. *duPont*, 308 U.S. 488, 498 (1940); *Charles T. Fisher*, 19 T.C. 384 (1952), affd. 209 F. 2d 513 (C.A. 6, 1954), and includable in gross income under section 61(a)(4) of the 1954 Code. Since there is no evidence in the record to support a finding that the discount in this case reflected elements or factors having no relation to interest, the conclusion is inescapable that the gain realized by petitioner upon the sale of the Boston note was essentially compensation for the use of its money. Accordingly, respondent's determination with respect to this issue is sustained.

*Decision will be entered under Rule 50.*

---

[3] SEC. 1222. OTHER TERMS RELATING TO CAPITAL GAINS AND LOSSES.
For purposes of this subtitle—
(3) LONG-TERM CAPITAL GAIN.—The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, * * *