Joseph I. Lubin and Evelyn J. Lubin v. Commissioner. Estate of Joseph Eisner, Deceased, Helen Eisner, Executrix, and Helen Eisner v. Commissioner.
Lubin v. Comm'r
Docket Nos. 85660, 85661.
United States Tax Court
T.C. Memo 1963-292; 1963 Tax Ct. Memo LEXIS 56; 22 T.C.M. (CCH) 1494; T.C.M. (RIA) 63292; October 24, 1963
*56 Mason G. Kassel, Harry J. Rudick, 25 Broadway, New York, N. Y., and John A. Gray, for the petitioners. Charles M. Greenspan, for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent has determined deficiencies in Federal income tax against the petitioners for the calendar year 1954 in the following amounts: Joseph I. and Evelyn J. Lubin
$524,681.99
Estate of Joseph Eisner and Helen
Eisner
$264,479.22 The issue remaining for decision is whether gain of $1,000,000 realized by petitioners on the retirement of 12 registered mortgage notes is taxable as long-term capital gain or as ordinary income. Findings of Fact The stipulated facts are hereby found accordingly. Petitioners Joseph I. Lubin (hereinafter sometimes referred to as petitioner) and his wife, Evelyn J. Lubin, resided during 1954, the taxable year in controversy, at 30 Montgomery Circle, New Rochelle, New York. They filed a timely joint Federal income tax return for 1954 with the district director of internal revenue, Upper Manhattan district, New York, New York. Petitioner Helen Eisner and her deceased husband Joseph Eisner (hereinafter sometimes *57 referred to as decedent), whose estate is also a petitioner, resided during 1954 at 300 Central Park West, New York, New York. They filed a timely joint Federal income tax return for 1954 with the district director of internal revenue, Upper Mahattan district, New York, New York. Decedent died on May 4, 1958. Helen Eisner is the duly qualified executrix of his estate. During the taxable year 1954 petitioner and decedent were Certified Public Accountants. They were senior partners of Eisner and Lubin, an accounting firm of New York, New York. In early March 1953, petitioner had a conversation with a broker, L. Lawrence Green (hereinafter referred to as Green). As a result of the talk it was petitioner's understanding that the stock of Sattler's, Inc. (hereinafter referred to as Sattler's), a department store in Buffalo, New York, was for sale. Petitioner also understood that the stock of Brighton Products, Inc. (hereinafter referred to as Brighton), which operated the meat department in Sattler's, was to be included in the sale. Petitioner understood the price to be $6,500,000 cash, with his liability for the purchase of the stock limited to a loan of $2,000,000. It was thought *58 that $4,500,000 could be raised by other financing. There was no financing commitment at the time. Petitioner expressed an interest in such an arrangement. He stated that he would not loan $2,000,000 for the stock purchase without a firm commitment of the other $4,500,000. Petitioner asked to see the various financial statements and reports of the companies. Green gave him a December 31, 1952 "report of examination and supplementary data" of Brighton, prepared by a certified public accounting firm. Petitioner was also given photostatic copies of the balance sheet and profit and loss statements of Sattler's. Petitioner requested a Certified Public Accountant's report on Sattler's financial condition, which report was given to him within three weeks. Relying on the figures contained in the financial statements, petitioner determined that the aggregate net worth of the two companies, exclusive of good will, was approximately $1,650,000 more than the $6,500,000 asking price. The profit and loss statement showed that, for the fiscal year ending January 31, 1953, Sattler's had earned net profits after Federal taxes of $790,426. After getting decedent's consent to a contemplated purchase, *59 petitioner told Green that he was definitely interested in obtaining the stock. It was petitioner's intention, if he did purchase the stock, to operate the company for about a year and then sell the stock, resulting in a long-term capital gain transaction. At this point, Green revealed that he was acting for Irving Levick (hereinafter sometimes referred to as Levick), who had discovered the opportunity. Green had not told petitioner about Levick previously because he wanted to be sure that petitioner was interested. Green told petitioner that Levick had to be considered in the arrangement, and a meeting of the three was set up. Petitioner did the negotiating for all petitioners. At the conference, Levick said that he had an interest in one or two specialty shops and a warehouse in Buffalo, New York. The warehouse was operated by Seneca Warehouse & Industrial Center, Inc. (hereinafter referred to as Seneca), which was controlled by Levick. At the time of these transactions, the stock of Seneca was owned as follows: Name of stockholder
No. of shares owned
Irving Levick
234.34
Mildred Levick
74.88
Heffren J. Cohen
24.51
Samuel C. and Harriet C.
Friedberg
24.51
Ludwig and Eva Becher
24.51
Max and Ethel M. Liebeskind
12.25
Paul P. Cohen
105.00
Total
500.00
*60 Petitioner told Levick that he was willing to acquire the stock of Sattler's. Levick replied that "it was his deal" and that he hoped to own the store. He suggested that the transaction be worked out in a way satisfactory to both, with Levick ultimately owning and operating the store. Petitioners were not interested in operating the store on a long-term basis. They were only interested in a transaction which would give rise to a capital gain, because they were all in a high surtax bracket. If the profit to arise from the transaction were taxed as ordinary income, petitioner would pay at the 91 percent rate. Petitioner suggested that he would purchase the stock, hold it for a long enough period to achieve capital gain rates, and then sell it to Levick. Levick preferred to own the stock and to hold himself out as the proprietor from the time of the purchase of Sattler's. Petitioner stated that he would agree to set up the acquisition in order to give Levick immediate ownership of the stock, so long as the transaction would produce a capital gain for the petitioners. Petitioner told Levick that he thought the two companies were worth at least $8,500,000 and that there was at least *61 a $2,000,000 profit in the proposed acquisition. He suggested that a plan be conceived under which the petitioners and Levick would each get $1,000,000. Petitioner then returned to his office to formulate an arrangement satisfactory to both sides. Petitioner consulted with Harry Janin (hereinafter referred to as Janin), an attorney who was the senior partner in charge of the firm's tax department. Petitioner gave the facts to Janin and asked how a capital gain might be achieved. Janin reviewed the law regarding income tax results of the issuance of registered instruments. During this review he read George Peck Caulkins, 1 T.C. 656 (1943), affd. 144 F. 2d 482 (C.A. 6, 1944). This case, which interpreted section 117(f) of the Internal Revenue Code of 1939, had been acquiesced in by the internal revenue service in 1944. Janin advised petitioner that the issuance of registered notes to evidence his loan should lead to capital gain when the notes were paid. Petitioner decided to enter the transaction on such a basis with Levick. Associated Investors, Inc. (hereinafter referred to as Associated), a New York corporation, was organized as a subsidiary of Seneca *62 in order to acquire the stock of Sattler's and Brighton. Prior to the transactions herein 100 percent of the stock of the two companies was owned by Charles Hahn, Jr. (hereinafter referred to as Hahn). On March 26, 1953, Associated contracted to purchase from Hahn 100 percent of the stock of the two companies. At that time, a down payment of $500,000 was given to Hahn. Associated obtained the money for the down payment from Seneca, which had gotten it from N & L Realty Corporation (hereinafter called N & L). N & L, which was owned 2/3 by petitioner and 1/3 by decedent, had borrowed the money, on the endorsements of decedent and petitioner, from The Marine Midland Trust Company at 3 1/2 percent annual interest. Associated assigned all of its right, title, and interest under the contract to N & L as collateral. The purchase contract of March 26, 1953, was reassigned by N & L to Associated on June 29, 1953, and was closed by Associated on that date. At that time petitioners paid $2,000,000 to Seneca. Under the terms of a loan agreement entered into between Seneca and petitioners on June 29, 1953, Seneca was required to apply $500,000 of the $2,000,000 to repayment of the N & L loan. *63 Under the terms of the loan agreement and a pledge agreement entered into on June 29, 1953 between Seneca and petitioners, the balance of the loan to Seneca was to be transferred by Seneca to Associated, and Associated was to apply such amount to the payment of the purchase price for the stock of Sattler's and Birghton. Petitioners' checks were to be made payable to N & L in the amount of $500,000 and to Hahn in the amount of $1,500,000. The remaining $4,500,000 payable at the closing was obtained through a temporary bank loan which was subsequently refinanced by two long-term insurance company loans. Simultaneously with the acquisition of the stock of Sattler's and Brighton, Associated caused Sattler's to transfer all of its operating assets except real property to Hallam Enterprises, Inc., a new corporation organized for the purpose, which then took the name Sattler's, Inc. Associated liquidated the old Sattler's and Brighton into itself, taking the name Brighton Products, Inc. (hereinafter called Associated/Products). Upon making the loan of $2,000,000 to Seneca, petitioners received 12 registered mortgage notes, each dated June 29, 1953, in the aggregate face amount of $3,000,000, *64 numbered serially 1 through 12 as follows: Serial
Note holder
no.
Principal amount
Petitioner
1
$ 250,000
2
250,000
3
250,000
4
250,000
Evelyn J. Lubin
5
250,000
6
250,000
7
250,000
8
250,000
Decedent
9
250,000
10
250,000
Helen Eisner
11
250,000
12
250,000
Total
$3,000,000 The notes were secured by a mortgage on the real property owned by Seneca; a chattel mortgage upon all movable personal property of Seneca contained in the warehouse premises; and the pledge agreement executed by the parties simultaneously with the loan, in which Levick personally guaranteed the payment of the notes. As broker in the transaction, Green was paid $25,000 by Seneca at the time of the execution and delivery of the notes. Pursuant to the terms of the pledge agreement, Levick, Mildred Levick, Heffren J. Cohen, and Paul P. Cohen deposited 438.73 shares of the 500 outstanding shares of Seneca with the petitioners. Seneca deposited with the petitioners all of the issued and outstanding stock certificates of Associated/Products, accompanied by executed, undated stock powers in blank. In addition, Seneca undertook to cause to be deposited *65 with petitioners, within 15 days after closing, the remaining outstanding shares of Seneca together with executed, undated stock powers in blank. Each of the notes received by the petitioners was captioned "Registered Mortgage Note." Each contained the following provision: This is a registered mortgage note. Books for the registry of this note are kept at the office of the maker. No transfer hereof shall be valid unless made in the form shown on the reverse side hereof, on notice to the maker hereof and entered on the maker's books, at its office, by the registered holder, in person, or by attorney, duly authorized in writing and similarly noted hereon. This note shall be presented for endorsement of all payments of principal and interest thereon. A registry book was set up and kept by Seneca. Entries regarding the notes were made in the regular course of business. Each note was in the principal amount of $250,000. The face amount of each note was payable $187,500 on January 4, 1954, and $5,208.33 on the fourth of each month thereafter until January 4, 1955. The borrower was permitted to prepay any or all installments due after January 4, 1954, with accrued interest to date *66 of payment. There was no provision for any penalty, nor for any reduction of the amount payable in the event of prepayment. The installments due January 4, 1954 were not paid on that date. Extensions of time were granted to Seneca at Levick's request. Each of the notes was paid as follows: Date
Sum due
Sum actually paid
1/ 4/54
$187,500.00
2/ 4/54
5,208.33
3/ 4/54
5,208.33
3/24/54
$104,166.66
4/ 4/54
5,208.33
4/ 6/54
5,208.33
5/ 4/54
5,208.33
5,208.33
6/ 4/54
5,208.33
5,208.33
6/30/54
130,208.35
7/ 4/54
5,208.33
8/ 4/54
5,208.33
9/ 4/54
5,208.33
10/ 4/54
5,208.33
11/ 4/54
5,208.33
12/ 4/54
5,208.33
1/ 4/55
5,208.33
$249,999.96
$250,000.00
Under the terms of the notes, interest was ostensibly payable at the rate of 2 percent per annum on the unpaid balance to the date of payment. Pursuant to this agreement, the following amounts were paid on each note: Date
Sum paid
1/ 4/54
$2,589.04
2/ 4/54
416.66
3/ 5/54
416.66
3/25/54
115.74
4/ 7/54
243.06
5/ 6/54
234.38
6/10/54
225.69
7/ 2/54
217.02
Total
$4,458.25 The total received by each petitioner pursuant to the interest agreement was: Name
Amount received
Petitioner
$17,833.05
Evelyn J. Lubin
17,833.06
Decedent
8,916.52
Helen Eisner
8,916.52
*67 Such amounts were reported by the respective petitioners on their 1954 income tax returns as interest income. None of the petitioners has ever acquired or sold registered notes in any other transaction. The tax liability disclosed on the tax return of petitioner and Evelyn J. Lubin for the year 1954 was $174,217.22. This liability was paid by checks drawn by petitioner to the order of the district director of internal revenue in New York, New York, on Bankers Trust Company, as follows: Date
Principal amount
January 5, 1954
$ 10,000.00
December 25, 1954
145,000.00
March 7, 1955
19,217.22
On October 13, 1960, petitioner and Evelyn J. Lubin forwarded to the respondent $173,145.06 as payment on account of interest on the proposed deficiency determined in the statutory notice of deficiency dated December 23, 1959. On August 27, 1962, petitioner and Evelyn J. Lubin forwarded to the respondent a check in the total amount of $454,026.72, consisting of $395,000 part payment of the proposed deficiency determined in the statutory notice of deficiency dated December 23, 1959 and $59,026.72 interest on such proposed deficiency. Opinion Petitioners contend on one *68 hand that the payment of the original issue discount was received by them on the redemption of an "evidence of indebtedness" so as to entitle them to treat the amount as capital gain rather than ordinary income; and, on the other hand, that what they furnished was "equity capital" as participants in a joint venture. Although not so described, these must be alternative contentions in view of their mutually exclusive character. We think it clear that what petitioners did was to loan money to Seneca so that it could purchase Sattler's stock and that when they received approximately $3,000,000 face value of Seneca bonds upon the payment of about $2,000,000 the difference was original issue discount. When this was collected upon ultimate, though partially delayed, redemption of the obligation, it was ordinary income unless, as petitioners insist, the provisions [1] of I.R.C. 1954, section 1232(a)(1), the successor to I.R.C. 1939, section 117(f), entitle them to treat the entire amount received as capital gain. A fortiori, if this were a joint venture, although we do not so regard it, income in the nature of interest would be ordinary income. *69 While for a number of years the view held by the Tax Court was that redemption of a bond entitled the holder to treat original issue discount as capital gain, George Peck Caulkins, 1 T.C. 656 (1943), affd. 144 F. 2d 482 (C.A. 6, 1944), we have more recently taken the position that, even though the obligation may be a capital asset, an amount received upon redemption which represents interest or discount is not part of the amount "received in exchange therefor" within the meaning of section 1232(a)(1) but is ordinary income. Richard B. Gibbons, 37 T.C. 569 (1961). See also Rosen v. United States, 288 F. 2d 658 (C.A. 3, 1961); United States v. Harrison, 304 F. 2d 835 (C.A. 5, 1962); $ Commissioner v. Morgan, 272 F. 2d 936 (C.A. 9, 1959), reversing 30 T.C. 881 (1958). The reasoning is described in United States v. Harrison, supra at 838: * * * Section 117(f) was enacted in response to Watson v. Commissioner, 1932, 27 B.T.A. 463. Watson held that since the capital gains provisions were tied to the term "sale or exchange", a bond retirement could not qualify. The *70 ruling blocked capital gains treatment in cases where by the underlying tests it would be appropriate; for example, the gain received when a bond purchased at a depressed market price is redeemed at par. The gain realized from such a transaction is a form of capital appreciation that resembles the capital gain received when stock or real estate is purchased and later sold at a profit, in contrast to an original issue discount gain which represents the interest or compensation paid for the use of the money loaned. * * * In a collateral but related situation Chief Judge Lumbard, speaking for the Court of Appeals for the Second Circuit, said: * * * A distinction has arisen between an income-producing capital asset and the income which it produces. * * * Thus the right to collect ordinary income is not transmuted into capital gain by its sale. * * *
Similarly, before the 1954 Code specifically covered the subject, [footnote omitted] most courts held that the excess of the amount received at the maturity of a non-interest bearing note or investment certificate issued at a discount over the cost thereof, being in the nature of an interest return on the capital invested, was *71 ordinary income. Commissioner v. Morgan, 272 F. 2d 936 (9 Cir. 1959); Rosen v. United States, 288 F. 2d 658 (3 Cir., 1961); Rev. Rul. 56-299, 1956-1 Cum. Bull. 603. Contra, Commissioner v. Caulkins, 144 F. 2d 482 (6 Cir. 1944). * * * [Jaglom v. Commissioner], 303 F. 2d 847, 848, 849 (C.A. 2, 1962), affg. 36 T.C. 126 (1961).] Nor is there any doubt that the same rule applies even though some nominal amount designated as interest may be provided for in the obligation. V. David Leavin, 37 T.C. 766 (1962). While the effective rate of interest received in that case was in the neighborhood of 25 percent per annum and that received here was about 50 percent, we cannot follow petitioners' suggestion that this could not be interest because the rate was higher than that paid by preferred risks borrowing from banks. Dorzback v. Collison, 195 F. 2d 69 (C.A. 3, 1952). We must assume that the parties made their agreement at arm's length and certainly that the borrower was entitled to treat the excess payment as deductible interest. C., R.I. & P. Railway Co., 13 B.T.A. 988, 1033 (1928), *72 modified on other issues 47 F. 2d 990 (C.A. 7, 1931), certiorari denied 284 U.S. 618. Petitioners' further contentions that the respondent is estopped to enforce this construction of the statute by reason of his acquiescence in George Peck Caulkins, supra, or that in any event his action in so doing was arbitrary and invalid, are disposed of by Arnold A. Schwartz, 40 T.C. 191, 193 (1963), decided after the instant briefs were filed. While the present record is somewhat more specific as to the extent of investigation by petitioners' attorney, [2] there was here no direct communication by respondent to the petitioners, cf. Lesavoy Foundation v. Commissioner, 238 F. 2d 589 (C.A. 3, 1956), reversing 25 T.C. 924 (1956); Geometric Stamping Co., 26 T.C. 301 (1956), nor any greater right than in Schwartz to rely on respondent's disablement to make a retroactive change. See James Couzens, 11 B.T.A. 1040, 1148-1151 (1928). * * * That in so doing [respondent] may have reversed his *73 prior action * * * does not in any manner offset the validity of his present determination or afford any basis for estoppel. * * * In the Massaglia case [Massaglia v. Commissioner, 286 F. 2d 258 (C.A. 10, 1961), affg. 33 T.C. 379 (1959)], the Court said (p. 262): But neither the duty of consistency, nor the principles of equitable estoppel bind the Commissioner to unauthorized acts of his agents, Sanders v. Commissioner, 10 Cir., 225 F. 2d 629, nor preclude him from correcting mistakes of law in the imposition and computation of tax liability, including the power to retroactively correct his rulings, regulations and decisions upon which taxpayers have relied. * * * [Municipat Bond Corporation, 41 T.C. - (Oct. 1, 1963).] See also Schafer v. Helvering, 83 F. 2d 317, 320 (C.A.D.C., 1936), affg. 32 B.T.A. 289 (1935), affd. 299 U.S. 171 (1936), where the court said: * * * Wrongs between man and man, which shock the conscience and justify the intervention of a court of equity, cannot affect or prejudice the sovereign in the right to demand the full measure of the statute. Whoever deals with the government *74 does so with notice that no agent can, by neglect or acquiescence, commit it to an erroneous interpretation of the law. * * * As to this issue, the deficiency is approved. To take account of conceded adjustments, Decision will be entered under Rule 50. Footnotes
1. SEC. 1232. BONDS AND OTHER EVIDENCES OF INDEBTEDNESS. (a) General Rule. - For purposes of this subtitle, in the case of bonds, debentures, notes, or certificates or other evidences of indebtedness, which are capital assets in the hands of the taxpayer, and which are issued by any corporation, or government or political subdivision thereof - (1) Retirement. - Amounts received by the holder on retirement of such bonds or other evidences of indebtedness shall be considered as amounts received in exchange therefor (except that in the case of bonds or other evidences of indebtedness issued before January 1, 1955, this paragraph shall apply only to those issued with interest coupons or in registered form, or to those in such form on March 1, 1954).↩
2. But see Janin, "The Israeli Bond Ruling: Legislation by Administrative Fiat?" 33 Taxes 191↩ (1955).