BARTON THEATRE COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Barton Theatre Co. v. Commissioner
Docket No. 4965-75.
United States Tax Court
T.C. Memo 1980-128; 1980 Tax Ct. Memo LEXIS 456; 40 T.C.M. (CCH) 198; T.C.M. (RIA) 80128; April 21, 1980, Filed *456 Held, petitioner's debentures constituted bona fide debt, entitling it to interest deductions under section 163; held further, petitioner realized gain in 1966 from the redemption of its stock in Atlas Organization, Inc., in 1966 upon the determination of the fair market value of assets it received; held further, petitioner subject to the section 6653(a) addition to the tax for negligent disregard of the rules and regulations. Tom G. Parrott and Donald B. Nevard, for the petitioner. James D. Thomas, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION *457 WILES, Judge: Respondent determined the following deficiencies in petitioner's Federal income taxes: Sec. 6653(a) Year
Deficiency
Addition to Tax
1965
$ 44,633.82
$2,231.69
1966
165,209.49
8,260.47
After concessions the issues remaining for decision are: 1. Whether petitioner's five percent debentures [1] constitute a bona fide debt entitling it to interest deductions under section 163; [2]
2. Whether petitioner's stock in Atlas Organization, Inc., was redeemed in 1966, and, if so, whether petitioner realized gain from such redemption; and 3. Whether petitioner's underpayments of tax in 1965 and 1966 were due to *458 negligence or intentional disregard of rules and regulations under section 6653(a). FINDINGS OF FACT Some of the facts were stipulated and are found accordingly. Barton Theatre Company (hereinafter petitioner) maintained its principal place of business in Oklahoma City, Oklahoma, when it filed its 1965 and 1966 income tax returns with the District Director of Internal Revenue at Oklahoma City, Oklahoma, and when it filed its petition in this case. Petitioner filed its returns using the cash receipts and disbursements method of accounting. Petitioner was incorporated in Oklahoma on July 27, 1964. During 1965 and 1966 all of petitioner's stock was owned by R. Lewis Barton, Dollye Barton, Robert L. Barton, Betty Lou Barton, Harold L. Combs, Joanna Combs, Gerald G. Barton and Jo C. Barton (hereinafter referred to as the Barton Family). R. Lewis Barton, deceased, and Dollye Barton are the parents of Robert L. Barton, Joanna Combs, and Gerald G. Barton. Betty Lou Barton, Harold L. Combs, and Jo C. Barton are the respective spouses of Robert L. Barton, Joanna Combs, and Gerald G. Barton. Prior to the incorporation of petitioner, the Barton Family was in the business of owning *459 and operating movie theatres and other income-producing property in the Oklahoma City area. Pursuant to a letter agreement dated September 17, 1964, the Barton Family offered to exchange certain properties (including movie theatres, real property, stocks and bonds) for all the original issued capital stock and debentures to be issued by petitioner. The agreement provided for an appraisal to be made of the properties to be conveyed. That appraisal was made by James P. Foley of Chicago, Illinois, who assigned a total net value of $8,033,459 to the properties as of January 1, 1965. By letter agreement dated May 17, 1965, petitioner and the Barton Family accepted the appraisals of the properties by James P. Foley and agreed to exchange those properties for petitioner's stock and debentures, effective January 1, 1965. Pursuant to this letter agreement, petitioner issued stock and debentures to the Barton Family as follows: Preferred
Common Names
Debentures
Stock
Stock
R. Lewis & Dollye Barton
$279,059
$1,700,000
$ 389,219
Robert L. & Betty Lou Barton
716,300
1,189,581
Joanna Combs & Harold L. Combs
666,600
1,228,483
Gerald G. Barton & Jo C. Barton
671,500
1,192,717
$2,333,459
$1,700,000
$4,000,000
*460 Petitioner issued shares of common and preferred stock to the Barton Family as follows: Shareholder
Common Stock
Preferred Stock
R. Lewis Barton
1,946
8,500
Dollye Barton
1,946
8,500
Robert L. Barton
11,896
Gerald G. Barton
11,927
Joanna Combs
11,291
Harold L. Combs
994
40,000
17,000
Petitioner issued debentures in the total face amount of $2,333,459 to the Barton Family as follows: Certificate No.
Registered Owner
Amount
1
R. Lewis Barton
$139,559.00
2
Dollye Barton
139,500.00
3
Robert L. Barton
654,900.00
4
Betty Lou Barton
61,400.00
5
Gerald G. Barton
604,500.00
6
Jo C. Barton
67,000.00
7
Joanna Combs
666,600.00
The debentures were evidenced by the issuance of debenture certificates signed by petitioner's president, Gerald G. Barton, and attested to by its assistant secretary, John C. Andrews. These certificates contained an expressed unconditional promise to pay a sum certain in money on the specified maturity date of January 1, 1985, in return for an adequate consideration in money or money's worth. They also contained a promise to pay interest at the rate of five percent per annum, payable *461 monthly on the first day of each month. During 1965 and 1966, petitioner made interest payments to the holders of its debentures as follows: R. Lewis &
Robert L. &
Harold J. &
Gerald G. & Year
Dollye Barton
Betty Lou Barton
Joanna Combs
Jo C. Barton
1965
$13,371.51
$34,322.67
$31,941.25
$32,175.96
1966
11,627.40
30,345.80
27,775.00
27,979.10
The debenture certificates further provided that the principal sum of the debentures and the interest due thereon were "subject to and subordinate to existing indebtedness due banks, i/nsurance companies, and other institutional lenders and to future indebtedness due to such lenders." Moreover, in the event petitioner was dissolved or liquidated, no payment was to be made upon the debentures until all other creditors of petitioner were paid in full. Petitioner owned 37.5 shares of stock in the Atlas Organization, Inc. (hereinafter Atlas). During 1966, petitioner and Atlas orally agreed to the terms embodied in an agreement entitled Stock Redemption Agreement (hereinafter Agreement). The written Agreement was drafted during December of 1966 but, due to the death of a partner in the *462 law firm which drafted the Agreement, it was not executed by the parties until January or February of 1967. The Agreement, however, was post-dated to take effect "as of January 1, 1966," and provided such date as effective for all conveyances, assignments, endorsements and deliveries pursuant thereto. Pursuant to the Agreement, petitioner agreed to convey to Atlas its 37.5 shares of Atlas stock, to assign to Atlas an undivided one-half interest in a real estate lease dated April 13, 1965, and to assume from Atlas a real estate mortgage in the principal amount of $116,666. In consideration for the foregoing, Atlas agreed to convey to petitioner 100 shares of common stock in Plaza Realty Corp. (hereinafter Plaza Realty) and 5,450 shares of common stock in United Founders Corp. (hereinafter UFC). Prior to the exchange of assets between petitioner and Atlas, the stock of Atlas was owned as follows: Number of Shares
Owner
37.5
Petitioner
12.5
Calvin Garrett
At the time of the exchange, petitioner had a basis of $375 in the 37.5 shares of Atlas stock. Atlas entered the 37.5 shares of stock received from petitioner on its books and certified financial statement *463 as treasury stock for calendar year 1966. By an instrument effective "as of January 1, 1966," petitioner assigned an undivided one-half interest in a 99-year real estate lease covering 13.63 acres of land in Denver, Colorado (hereinafter Denver lease), to Atlas as provided for by the Agreement. The assignment was noted on Atlas' financial statement for 1966. The fair market value of the entire Denver lease was $559,800, making the 50 percent interest assigned to Atlas worth $279,900. Petitioner had no basis in the lease. Pursuant to the Agreement, petitioner executed an Agreement of Assumption of Indebtedness reflecting its assumption of the balance of principal and interest due as of January 1, 1966, on a note in the principal amount of $116,666 given by Atlas to United Founder's Life Insurance Company (hereinafter the Atlas note). Although the balance owed on the Atlas note on January 1, 1966, was $116,159.70, Atlas paid $2,876.76 (plus interest of $6,317.59) on October 25, 1966, leaving a principal balance of $113,282.94 actually assumed by petitioner. The Atlas note was removed from Atlas' books and certified financial statements for calendar year 1966. Under the Agreement, *464 Atlas transferred 100 shares of Plaza Realty stock to petitioner. Plaza Realty was incorporated under the laws of the State of Oklahoma on April 9, 1965. Prior to petitioner's acquisition of the 100 shares of Plaza Realty stock pursuant to the Agreement, Plaza Realty stock was owned as follows: Shareholder
Number of Shares
Petitioner
100
Atlas
100
Oklahoma Industrial
Development Corp.
100
Total
300
On April 9, 1965, Plaza Realty acquired a fee simple interest in Blocks 1 and 1-A of United Founders Life Plaza Addition located at the southwest corner of the intersection of Northwest 59th Street and North May Avenue and comprised of approximately 14.4 acres. Approximately 11.2 acres of the property was improved with a 93,282 square foot retail discount center building (hereinafter referred to as the Shoppers World Building), a 307,000 square foot asphalt parking lot and 87,300 square feet of concrete drives, walks, curbs, etc. The Shoppers World Building is a one-story, modern, fully air conditioned masonry building with 7,392 square feet of mezzanine area used for office space and anciliary purposes. Plaza Realty paid $1,000,000 for the Shoppers World *465 Building. It received Blocks 1 and 1-A of United Founders Life Plaza Addition upon incorporation from its shareholders (petitioner, Atlas and the Oklahoma Industrial Development Corporation).
The shareholders of Plaza Realty had acquired the property from United Founders Life Insurance Company on March 31, 1965, for $450,000 and the assumption of a $800,000 mortgage. [3] Petitioner, Atlas, and the Oklahoma Industrial Development Corporation gave mortgage notes to the United Founders Life Insurance Company in the principal amounts of $116,666, $116,666, $116,668, respectively. Plaza Realty paid United Founders Life Insurance Company the remaining $100,000 of the purchase price in cash. *466 On May 17, 1965, Plaza Realty mortgaged Blocks 1 and 1-A of United Founders Life Plaza (except for the West 200 feet of Block 1) and improvements thereon as security for a loan of $1,100,000 from Mercantile National Bank, Dallas, Texas. Pursuant to the mortgage, a Guaranty Agreement was executed by the Barton Family, whose individuals had an aggregate net worth in excess of $5,000,000. The Guaranty Agreement provided, in pertinent part, "The Guarantors understand that the lender is unwilling to make the Loan to Plaza, unless the obligations of Plaza under the note evidencing the Loan and the mortgage and collateral assignments securing payment thereof shall be unconditionally and jointly and severally guaranteed by the Guarantors." The property remained encumbered by the mortgage through December 31, 1966. During 1965 and 1966, the sole business of Plaza Realty was the leasing of the Shoppers World Building. From the completion of its construction for approximately $1,000,000 in September 1962 through 1964, the Shoppers World Building was operated under the name of Shoppers World. In 1965 the trade name of the Shoppers World Building was changed to Founders Fair. During 1965 *467 and 1966, the discount business in the Shoppers World Building was conducted by another corporation designated the Plaza Corporation. During 1963, 1964, and the first four months of 1965, prior to Plaza Realty's acquisition of the Shoppers World Building, the owner/lessor of that building received gross rental income of $95,000, $90,000 and $35,389.12, respectively. The gross rental income received by Plaza Realty as owner/lessor of the Shoppers World Building during the last eight months of 1965 and all of 1966 was $50,000 and $103,639, respectively. During those years Plaza Realty sustained net operating losses in the respective amounts of $7,313.26 and $7,316.62, and prior to January 1, 1966, the Shoppers World Building did not generate enough rental income to meet the mortgage payments on the property. The $5,450 shares of UFC stock petitioner received from Atlas pursuant to the Agreement were not issued by the transfer agent to petitioner until Mrach 1, 1967. Atlas had acquired these shares from UFC in exchange for UFC debentures at the rate of one share of stock for each $11 face amount of debentures. On December 15, 1965, Atlas sold $75,000 face amount of the debentures *468 for $75,000 cash. On January 1, 1966, the effective date for the exchange of assets between petitioner and Atlas, as stated in the Agreement, registered UFC stock was being traded in the over-the-counter market at $11 per share. During 1965 and 1966, Edwinna Bridges, an employee of petitioner, maintained its books and records and prepared its tax returns. She had kept the books and records for the Barton Family business from 1949 through 1966. Petitioner's financial statements during those years were prepared by the CPA firm of Arthur Anderson & Co. Whenever Edwinna Bridges had any questions with respect to an accounting or tax matter regarding petitioner's books and records, she consulted with Arthur Anderson & Co. or Mosteller, Andrews, & Mosburg, petitioner's law firm, for tax advice. Although employees of Arthur Anderson & Co. thought that Edwinna Bridges did a good job, they did not like her system of bookkeeping. Respondent's examining agent informed petitioner's representatives on numerous occasions that its records were inadequate. On its 1965 and 1966 returns, petitioner reported only 50 percent of its capital gains. In 1966, petitioner did not report on its *469 return the exchange of assets with Atlas. In his notice of deficiency respondent disallowed interest deductions taken by petitioner in 1965 and 1966 with respect to its debentures claiming the interest expense did not constitute an ordinary and necessary business expense. Respondent further determined that petitioner failed to report gain realized in the amount of $310,081.96 in 1966 on exchange of Atlas stock for certain properties computed as follows: [4]
Consideration Received: 100 shares of Plaza stock
$366,666.66
5,450 shares of UFC stock
59,950.00
Total
$426,616.66
Less: Basis in Atlas stock
$ 375.00
Liability of Atlas assumed
116,159.70
116,534.70
Gain on Exchange
$310,081.96
Finally, respondent determined that part of the underpayment of tax for 1965 and 1966 was due to negligence or intentional disregard of rules and regulations and, therefore, asserted the five percent *470 addition to the tax. OPINION The issues for decision are: 1. Whether petitioner's five percent debentures constitute a bona fide debt entitling it to interest deductions under section 163; 2. Whether petitioner's stock in Atlas Organization, Inc., was redeemed in 1966, and, if so, whether petitioner realized gain from such redemption; and 3. Whether petitioner's underpayments of tax in 1965 and 1966 were due to negligence or intentional disregard of rules and regulations under section 6653(a). 1. Debentures
During 1965 and 1966, petitioner claimed deductions for interest expense in the respective amounts of $111,811.39 and $97,727.30 paid on five percent debentures held by its shareholders. Respondent maintains that since the debentures do not represent bona fide debt, the payments made with respect to the debentures do not constitute interest deductible under section 163(a) but rather are dividends paid with respect to the equity of petitioner. Respondent's position is based on the following arguments: (1) Interest on the debentures was not paid in full; (2) The debentures were issued for essential assets of the business; and (3) The debentures were *471 subordinated to institutional lenders. The debt-equity issue has generated numerous cases which have set no clearly defined standards but usually depend upon the facts and circumstances therein. John Kelley Co. v. Commissioner, 326 U.S. 521 (1946). The cases generally compare the purported debt at issue with a list of factors which are commonly regarded as identifying the characteristic differences between debt and equity for income tax purposes. Fin Hay Realty Co. v. United States, 398 F. 2d 694 (3d Cir. 1968); J.S. Biritz Construction Co. v. Commissioner, 387 F. 2d 451 (8th Cir. 1967); O.H. Kruse Grain & Milling v. Commissioner, 279 F. 2d 123 (9th Cir. 1960); Foresun, Inc. v. Commissioner, 41 T.C. 706 (1964), affd. 348 F. 2d 1006 (6th Cir. 1965). This Court has noted that the determinative question to which an evaluation of the various independent factors point are: "Was there a genuine intention to create a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtorcreditor relationship?" Litton Business Systems, Inc. v. Commissioner, 61 T.C. 367, 377 (1973). *472 On the basis of this record, we believe that question must be answered in the affirmative and hold for petitioner. Respondent contends that, since petitioner made payments constituting only 96 percent and 84 percent of the total amount of interest due to the debenture holders during 1965 and 1966, respectively, this demonstrates that the debentures did not represent bona fide debt. [5] Although petitioner had sufficient assets to meet its obligation during the years at issue, a cash shortage prevented it from making all the payments on its obligations when due. The testimony of petitioner's president revealed that petitioner was delinquent in paying all of its creditors, not just its debenture holders, and paid only those creditors which were most insistent upon receiving the payments procedures to which they were entitled. Furthermore, a holder of petitioner's debentures testified that after making several telephone calls and threatening to sue petitioner for her interest payments, she was promptly paid. *473 We do not believe the payments due on the debentures were so contingent on earnings and profits that they should be treated as dividends. Petitioner had cash flow problems and therefore a valid business reason for falling behind in making the interest payments on the debentures. As soon as a holder of its debentures threatened to enforce her right to payment, petitioner promptly met its obligation. There is no evidence in this record that there existed an understanding between petitioner and the debenture holders with respect to the payment of interest. See Tomlinson v. 1661 Corp., 377 F. 2d 291, 299 (5th Cir. 1967). Respondent next maintains that the properties conveyed to petitioner in exchange for the debentures at issue were of an operating nature and necessary to continue the scope of the family business as it had been conducted prior to petitioner's incorporation. Hence, he argues, there was no business need for debt financing and the use of funds for purchase of the origifnal assets of a business indicates a contribution to capital rather than debt. Although this argument has been considered in determining the debt-equity issue, see Covey Investment Co. v. United States, 377 F. 2d 403 (10th Cir. 1967); *474 Schnitzer v. Commissioner, 13 T.C. 43 (1949), affd. per curiam 183 F. 2d 70 (9th Cir. 1950), this Court has recognized that, regardless of business need for debt financing, a corporation may have a business purpose independent from tax considerations for such financing. Morgan v. Commissioner, 30 T.C. 881, 891 (1958), revd. on other issues 272 F. 2d 936 (9th Cir. 1959). We believe there was a valid business purpose for petitioner issuing its debentures as part of its capitalization. Petitioner was formed as a result of a family decision to transfer all its assets to one entity and conduct its affairs in the form of a corporation. The senior members of the Barton Family, R. Lewis and Dollye Barton, were issued only 10 percent of petitioner's voting stock and did not otherwise participate in the management of petitioner. They apparently decided to play a passive role in petitioner and the issuance of nonvoting preferred stock and the debentures at issue facilitated that decision. Moreover, a holder of petitioner's debentures testified that she insisted upon the issuance of the debentures in exchange for the income-producing *475 property she transferred to petitioner. Since she and her family moved from Oklahoma to California without employment or business opportunities, they depended on the quaranteed mothly income from the debentures and relied on it to qualify for a loan to purchase a home. We are convinced from this testimony that petitioner's debentures were issued to facilitate the Barton Family's decision to transfer its assets to petitioner in order to operate in a corporate form and view this as a sound business purpose for creating such debt. Respondent's final argument is that, since petitioner's debentures were subordinated to other indebtedness, they were placed at the risk of the business and therefore should be treated as equity. Petitioner's debentures, however, were not completely subordinated to other indebtedness but, for so long as petitioner remained in business, were subordinated only to indebtedness "due banks, insurance companies, and other institutional lenders." The debentures were subordinated to the claims of general creditors only in the event of petitioner's liquidation or dissolution.Even in that event, the holders of petitioner's debentures still would have priority over *476 the claims of the holders of all classes of petitioner's stock. Petitioner's financial statements also show that approximately 90 percent of its institutional indebtedness is secured by mortgages. Therefore, unless petitioner is dissolved or liquidated, the debentures are only subject to mortgage indebtedness and the debenture holders possess rights substantially similar to those of the general creditors of petitioner. Although this does give an apparent theoratical preference to the mortgage debt, in reality this preference is built in by the lien and enforcement provisions of the mortgage indebtedness. Tomlinson v. 1961 Corp., supra at 298.
The subordination of petitioner's debentures is not in itself fatal to classifying such obligations as bona fide debt; the importance of subordination depends on the presence of other factors. See Trans-Atlantic Co. v. Commissioner, 469 F. 2d 1189, 1194 (3d Cir. 1972); Scriptomatic, Inc. v. United States, 397 F. Supp. 753, 760 (E.D. Pa. 1975). Petitioner's president testified that the subordination provision *477 was suggested by its primary bankers to eliminate the necessity of having to obtain subordination agreements from all of the debenture holders whenever petitioner needed to obtain a loan from an institutional lender. In view of the other characteristics of petitioner's debentures, the subordination provision at issue does not preclude classifying such debentures as bona fide debt.
Moreover, we believe the factors respondent chose to ignore are highly supportive of petitioner's position. The debentures contained an unconditional promise to pay a sum certain in money payable within a reasonable period of time and on a fixed maturity date. Payment of principal and the fixed interest was not dependent on the earnings or discretion of petitioner. Furthermore, the debentures held by members of the Barton Family, were not in any way proportionate to their equity ownership in petitioner. The debentures gave the holders no voting or management powers in petitioner which, as expressly provided in the debentures, did not reserve the option to redeem the outstanding debentures. They were not callable and were not convertible into petitioner's stock. The debentures were evidenced by the *478 issuance of written instruments which contained all of the formal indicia of an indebtedness. Respondent has conceded that petitioner was not thinly capitalized. As noted in Nassau Lens Co. v. Commissioner, 308 F. 2d 39, 46 (2d Cir. 1962) "There is no rule which permits the Commissioner to dictate what portion of a corporation's operations shall be provided for by equity financing rather than debt, so long as the latter can be said to be debt in terms of substantial economic reality." [Cite omitted.] Based on all the surrounding facts and circumstances, we find the parties at the time the debentures were issued and through the taxable years at issue intended to create and did in fact maintain a debtor-creditor relationship. 2. Redemption
During 1966 petitioner and Atlas negotiated an Agreement for the exchange of assets which included the redemption of Atlas stock held by petitioner. Although dated as of January 1, 1966, the Agreement was not formally executed by the parties until January or February 1967. Pursuant to the Agreement, petitioner not only conveyed 37.5 shares of Atlas stock, but also assigned an undivided one-half interest in a real *479 estate lease and agreed to assume an Atlas real estate mortgage in the principal amount of $116,666. In consideration for the foregoing, Atlas conveyed to petitioner 100 shares of common stock in Plaza Realty and 5,450 shares of common stock in UFC. At issue is (1) whether the exchange occurred in 1966 or 1967, and (2) if it occurred in 1966, the fair market value of the 100 shares of Plaza Realty stock and the 5,450 shares of UFC stock for determining whether petitioner realized any gain from the exchange.
Petitioner maintains that since the Agreement was formally executed in 1967 and the assets exchanged pursuant to the Agreement were not transferred until after such time, the redemption occurred in 1967, a taxable year not presently before us and barred by the statute of limitations. In the alternative, petitioner maintains that, regardless of when the redemption occurred, it realized no gain but instead sustained a loss as a result of the redemption. Respondent contends that petitioner entered the Agreement as of January 1, 1966, and, in his brief, claims petitioner realized gain of $312,958.72 during 1966 from the exchange of assets with Atlas. [6] On the basis of this record, *480 for reasons set out below, we agree with respondent as to the timing of the exchange.Therefore, in deciding whether petitioner realized any gain from the exchange, we must determine the value of the Plaza Realty and UFC stock petitioner received from Atlas. Petitioner relies on section 317(b)[7] in support of its contention that the redemption occurred during 1967. In petitioner's view, the governing rule with respect to the timing of the redemption is that the transaction occurred at the time the redeemed stock was transferred to the redeeming corporation. The difficulty with petitioner's argument is that the only credible evidence in the record clearly indicates that the redeemed Atlas stock was actually transferred to Atlas in 1966. The 37.5 shares *481 of Atlas stock redeemed by Atlas pursuant to the Agreement were reflected as Treasury stock on the balance sheet of Atlas for the calendar year 1966. This indicates not only that petitioner transferred the stock to Atlas in 1966, but also that Atlas regarded the stock as one of its assets in that year. [8]
*482 Furthermore, since the Agreement was dated as of January 1, 1966, it is clear the parties intended the exchange to be effective on that date. Regardless of when the Agreement was formally executed, parties may agree that a "written contract shall take effect as of a date earlier than that on which it was executed, and when this is done, the parties will be bound by such agreement." Brewer v. National Surety Corp., 169 F. 2d 926, 928 (10th Cir. 1948); United States Mineral Products Co. v. Commissioner, 52 T.C. 177, 193 (1969). In addition, credible testimony of the attorney who handled the redemption confirmed that the parties had struck their deal by the time they approached him early in January 1966. Indeed, all available records fully indicate that the parties made book entries reflecting the exchange of assets on their books during 1966. The 37.5 shares of Atlas stock was reflected as Treasury stock on Atlas's balance sheet for 1966 and the Atlas note assumed by petitioner does not appear as a liability on the same balance sheet. Similarly, the United Founders Life Insurance Company proxy statement with respect to the November 4, 1969, meeting *483 of shareholders refers to the assumption of the Atlas note by petitioner on January 1, 1966. Although no book entry for the transfer of the 100 shares of Plaza Realty stock to petitioner was made by Atlas because that stock was never entered as an asset on Atlas's books, the 5,450 shares of UFC stock Atlas transferred to petitioner under the Agreement was removed from Atlas's books as an asset during 1966. While petitioner's journal entries and ledgers reflecting asset accounts were not available, every record in evidence in this case is consistent with the fact that the parties did, in fact, treat the assets as having been exchanged during 1966. The validity of an agreement for the sale of assets has been upheld in the absence of a formal contract, even where the parties later reduce the agreement to written form. United States Mineral Products Co. v. Commissioner, supra. The execution of the written Agreement in the instant case was only a formality memorializing the oral agreement which had already been consummated by the parties during 1966. Since the parties conducted themselves in accordance with their oral agreement, we find the redemption occurred *484 in 1966 as they intended by post-dating the Agreement to January 1 of that year. Next we must value the UFC and Plaza Realty stock to determine whether petitioner realized any gain from the exchange The question of "valuation of stock for tax purposes is a matter of 'pure fact.'" Hamm v. Commissioner, 325 F. 2d 934, 938 (8th Cir. 1963), affg. a Memorandum Opinion of this Court. In general, this question requires a determination of "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Sec. 20.2031-1(b), Estate Tax Regs., United States v. Cartwright, 411 U.S. 546, 551 (1973); see also Estate of McNary v. Commissioner, 47 T.C. 467 (1967). As to the 5,450 shares of UFC stock, petitioner initially agreed with respondent that the fair market value of such stock was $11 per share or $59,950 and stipulated that UFC registered stock was being traded in the over-the-counter market at approximately *485 $11 per share at the time of the exchange. By amending its pleadings, petitioner later contended that the UFC stock was restricted (legend) stock and, therefore, subject to a discount.Respondent claims petitioner presented no credible evidence showing the stock was in fact restricted stock. We agree.
Petitioner simply has not carried its burden of showing that the UFC stock was in fact restricted stock. The only evidence produced was the self-serving testimony of petitioner's president, Gerald G. Barton, which is insufficient to establish that the stock in question was restricted. Petitioner's reliance on LeVant v. Commissioner, 376 F. 2d 434 (7th Cir. 1967), misses the point. At issue in LeVant was the discount that should be applied to the market price of the stock in determining the fair market value of the stock. Unlike petitioner, the taxpayer in that case had established that the stock to be valued was restricted stock. We find the fair market value of the UFC stock on January 1, 1966, was $11 per share and, therefore, the value of the 5,450 shares petitioner received from Atlas under the Agreement was $59,950 on that date. The testimony of the president *486 of Atlas at the time of the exchange revealed that the parties in relying on the over-the- counter price, attached this value to the UFC stock transferred to petitioner. Moreover, in acquiring the UFC stock shortly before the exchange at issue, Atlas converted UFC debentures at the rate of one share of the UFC stock for each debenture with a face amount of $11. Finally those debentures had a fair market value of the full face amount during that time in that on December 15, 1965, fifteen days prior to the exchange, Atlas sold $75,000 face amount of those debentures for $75,000 cash. Next we must determine the fair market value as of January 1, 1966, of the 100 shares of Plaza Realty stock petitioner received pursuant to the exchange. In the notice of deficiency, respondent valued the Plaza Realty stock at $366,666.66 by using an appraisal of the fair market value of the company's assets reduced by the outstanding liabilities and dividing that figure by 3. (The 100 shares of Plaza Realty stock constituted a one-third interest in the corporation.) Petitioner argues that the stock was without value. Both parties, however, utilized the services of valuation experts for this trial. *487 In determining the value of the Plaza Realty stock, we have made use of the entire record, including the stipulation of facts, all the documentary evidence, the complete and detailed testimony of all witnesses, especially the expert witnesses and their reports. In particular, we have relied on the testimony and reports of petitioner's expert, East, and respondent's expert, Schmook, both of whom made their valuations as of January 1, 1966, for this case. Plaza Realty was organized for the purpose of holding title to and leasing its only asset, Blocks 1 and 1-A of United Founders Life Plaza Addition and the Shoppers World Building located thereupon. Therefore, in determining the value of the Plaza Realty stock, emphasis must be placed upon the fair market value of the underlying asset. The parties substantially agree on the value of the Shoppers World Building and other improvements on the land. By utilizing the cost approach method of valuation, Schmook arrived at the value of $827,925 and East arrived at the value of $877,895. For reasons set out below, we agree with Schmook's valuation and find the value of the Shoppers World Building and improvements to be $827,925 as *488 of January 1, 1966. In determining the value of the Shoppers World Building, Schmook allowed for three years of depreciation on the basis of a forty-year life expectancy because it was three years of age at the time of the valuation. He also made an allowance for deferred maintenance of improvements such as asphalt parking, heating, and air conditioning. Since the improvements did not produce enough rental income to support the value of the land, Schmook viewed the Shoppers World Building as an underimprovement to the land and provided for a greater allowance for functional obsolescence than East did. We agree and find his greater allowance for functional obsolescence reasonable and justified. As to the value of the 627,284 square feet of land (approximately 14.4 acres), however, the parties substantially disagree. Unilizing the cost approach method of valuation, both experts relied on sales of surrounding parcels of land in the United Founders Life Plaza Addition for comparison purposes. East valued the land at $1 per square foot, whereas Schmook valued it at $2 per square foot. For reasons set out below, we agree with Schmook and find the value of the land to be $2 per *489 square foot for a total of $1,254,568 as of January 1, 1966. In view of the sales in the United Founders Life Plaza Addition at $1.94 per square foot on May 2; 1963, and at $2.83 per square foot on June 30, 1967, East's valuation at $1 per square foot is entirely unrealistic. He emphasized the March 31, 1965, sale of the subject property for $450,000 but failed to take into account the assumption of the $800,000 mortgage by the purchasers. East rationalized his low valuation, as compared to sales of parcels surrounding the subject property, by stating that smaller parcels tend to sell at higher per square foot rates than larger parcels. Although that rationale may be true, it still does not justify his substantial discounting of the going market rate of parcels within the United Founders Life Plaza Addition. Schmook's valuation was at the lower end of the range of $2 per square foot at which surrounding parcels were selling for on or about January 1, 1966. His valuation is further supported by the opinion of the president of one of the world's largest mortgage companies that the subject property was worth $2 per square foot as of March 27, 1965. That opinion is particularly *490 persuasive in that it was prepared in connection with his decision to make a loan of $1,100,000 on the property, a very large amount of money. Since the underlying asset of Plaza Realty had a fair market value of $2,089,493 on January 1, 1966 ($827,925 plus $1,254,568) and was subject to a $1,100,000 mortage on that date, we find that the net asset value of Plaza Realty was $982,493. In determining the fair market value of Plaza Realty stock, respondent argues that the net asset value is the sole factor for consideration in making the valuation. Petitioner contends that the net asset value should be discounted when considering other factors relevant to valuing closely held stock. See Hamm v. Commissioner, supra at 941; Estate of Schroeder v. Commissioner, 13 T.C. 259, 263 (1949). Finding respondent's approach too simplistic, we agree with petitioner. At the time of this valuation, Plaza Realty was experiencing difficulties. During 1965 and 1966, it sustained net operating losses in the respective amounts of $7,313.26 and $7,316.62.Prior to January 1, 1966, the Shoppers World Building did not generate enough rental income to meet the *491 mortgage payments on the property. Moreover, petitioner's president testified that the discount business in the Shoppers World Building had a reputation throughout the Oklahoma City business community as a "white elephant." He further testified that during 1964 and 1965 he made extensive efforts to either lease or sell the Shoppers World Building and was unsuccessful with such stores as K-Mart, TG & Y, and Woolco. Nonetheless, as noted in Schmook's valuation report, the land involved was underutilized as a site for the Shoppers World Building in that the site had more than adequate parking space and there was still an inordinate amount of raw land surrounding the Shoppers World Building. Moreover, the land was very valuable because of its location on one of the busiest throughfares in the Oklahoma City area. Taking into account the aforementioned and all other relevant factors, we have concluded that the net asset value of Plaza Realty must be discounted by 30 percent. Thus, we find that the fair market value of the Plaza Realty stock petitioner received from Atlas was $229,248 ($982,493 discounted by 30 percent and divided by 3 because the Plaza Realty stock valued constituted *492 a one-third interest in this corporation). 3. Addition to Tax
Respondent determined that part of petitioner's underpayment of tax for 1965 and 1966 was due to negligence or intentional disregard or rules and regulations, and, therefore asserted the five percent addition to the tax pursuant to section 6653(a). Since respondent's determination is presumed correct, petitioner has the burden of showing the addition was improperly asserted. Enoch v. Commissioner, 57 T.C. 781, 802-03 (1972); Rule 142(a), Tax Court Rules of Practice and Procedure.
Respondent maintains that petitioner's failure to report the exchange of assets with Atlas, combined with its understatement of capital gains in 1965 and 1966 and its failure to keep adequate books and records for those years, justifies the assertion of the addition. Petitioner argues that the addition should not be imposed because Edwinna Bridges, a long-time trusted and competent bookkeeper, kept adequate books and records and prepared its tax returns, regularly seeking the advice of certified public accountants and lawyers *493 with respect to accounting and tax problems. Petitioner's reliance upon its bookkeeper is misplaced.A taxpayer cannot simply avoid the duty of filing accurate returns by shifting the responsibility to an agent. American Properties, Inc. v. Commissioner, 28 T.C. 1100, 1117 (1957); Bailey v. Commissioner, 21 T.C. 678, 687 (1954).Moreover, petitioner made no showing of having acted in good faith in reliance on Edwinna Bridges' bookkeeping practices. American Properties, Inc. v. Commissioner, supra.Not only had respondent's examining agent informed petitioner's representatives on numerous occasions that its records were inadequate, but employees of petitioner's accounting firm had a low regard for Edwinna Bridges' system of bookkeeping. Since petitioner has failed to convince us that its underpayments of tax in 1965 and 1966 were not due to negligence, we must sustain respondent's determination. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. The term "debenture" shall be used for convenience, though, as respondent notes in his brief, the name attached to the instrument is not thereby controlling. ↩
2. Statutory references are to the Internal Revenue Code of 1954, as amended.↩
3. Based upon this purchase price, the rate per square foot for the property was approximately $1.98. The rate per square foot for sales of property within United Founders Life Plaza Addition are summaized as follows: ↩ Date of Sale
No. of Sq. Ft.
Price Per Sq. Ft.
May 29, 1963
39,853
$1.94
1963
20,000
2.00
1963
62,000
2.00
1963
33,000
2.00
1963
40,000
2.06
January 3, 1964
20,000
2.00
March 31, 1964
33,000
2.02
March 29, 1965
23,000
2.00
August 13, 1965
24,467
2.50
February 12, 1967
15,000
2.70
June 22, 1967
15,000
2.70
June 30, 1967
582,000
2.25
June 30, 1967
140,000
2.50
June 30, 1967
1,400,000
2.83
4. This was respondent's alternative position in the notice of deficiency.Since the parties focused on that position at trial and in their briefs, they apparently have agreed to disregard respondent's other position set out in the same notice of deficiency.↩
5. Respondent further contends that the debentures were not true debt because petitioner made less than 100 percent of the payments due on the debentures in years subsequent to 1965 and 1966. Our characterization of petitioner's debentures, however, is limited to the taxable years before us, 1965 and 1966, so we refuse to consider facts which may be relevant in characterizing the debentures for other taxable years. See Cuyana Realty Co. v. United States, 180 Ct. Cl. 879, 382 F. 2d 298, 301 (1967); Tampa & Gulf Coast Railroad Co. v. Commissioner, 56 T.C. 1393, 1402 (1971), affd. 496 F. 2d 263↩ (5th Cir. 1972).
6. Respondent claims that the evidence at trial indicates that petitioner actually assumed a liability on the Atlas note to UFC in the amount of $113,282.94, rather than $116,159.70 as determined in the notice of deficiency. Since the record shows that Atlas did satisfy $2,876.76 of the principal on the note prior to transferring it to petitioner, we agree with respondent's determination on brief and have found accordingly.↩
7. SEC. 317. OTHER DEFINITIONS. (b) Redemption of Stock.--For purposes of this part, stock shall be treated as redeemed by a corporation if the corporation acquires its stock from a shareholder in exchange for property, whether or not the stock so acquired is cancelled, retired, or held as Treasury stock. ↩
8. Having disposed of petitioner's section 317(b) argument, we must also reject its reliance on Estate of Moore v. Commissioner, T.C. Memo. 1961-257↩. There the Court found that the redeeming corporation had not acquired its stock from the taxpayers in the year during which respondent claimed the redemption therein had occurred. That case is further distinguishable in that, as discussed below, petitioner went beyond preparatory actions in 1966 with respect to the redemption at issue herein.